**No. 25-50660**

# In the United States Court of Appeals for the Fifth Circuit

CHRISTOPHER FERGUSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

*Plaintiff – Appellant / Cross–Appellee,*

*v.*

TEXAS FARM BUREAU; TEXAS FARM BUREAU BUSINESS CORPORATION; TEXAS FARM BUREAU CASUALTY INSURANCE COMPANY; TEXAS FARM BUREAU MUTUAL INSURANCE COMPANY; TEXAS FARM BUREAU UNDERWRITERS; FARM BUREAU COUNTY MUTUAL INSURANCE COMPANY OF TEXAS; SOUTHERN FARM BUREAU LIFE INSURANCE COMPANY,

*Defendants – Appellees/Cross Appellants.*

---

On Appeal from the United States District Court for the
Western District of Texas
Case No. 6:17-CV-111

---

**BRIEF OF PLAINTIFF – APPELLANT/CROSS – APPELLEE**

---

AVI MOSHENBERG
Texas Bar No. 24083532
avi.moshenberg@lmbusinesslaw.com
LAWSON & MOSHENBERG PLLC
2301 Commerce Street, Suite 200
Houston, TX 77002
*Appellant / Cross – Appellee's Counsel*

## CERTIFICATE OF INTERESTED PERSONS

Case No. 25-50660, *Christopher Ferguson v. Texas Farm Bureau, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs – Appellant/Cross-Appellee:**

Christopher Ferguson on behalf of all other similarly situated Farm Bureau Agency Managers

**Counsel for Plaintiff – Appellant/Cross-Appellee:**

Avi Moshenberg
Nicholas Lawson
Lawson & Moshenberg PLLC

Kelly E. Cook
Warren A. Berlanga
Wyly & Cook PLLC

Sean McCarthy
Brian Abramson
Williams Hart Boundas, LLP

**Defendants – Appellees/Cross-Appellants:**

Texas Farm Bureau
Texas Farm Bureau Business Corporation
Texas Farm Bureau Casualty Insurance Company
Texas Farm Bureau Mutual Insurance Company
Texas Farm Bureau Underwriters
Farm Bureau County Mutual Insurance Company of Texas
Southern Farm Bureau Life Insurance Company

**Counsel for Defendant – Appellee/Cross-Appellant Southern Farm Bureau Life Insurance Company:**

Markham R. Leventhal
Irma Reboso Solares
Stephanie A. Fichera
Scott Abeles
Carlton Fields, P.A.

**Counsel for All Other Defendants – Appellees/Cross-Appellants:**

Barry A. Moscowitz
Leslie W. Richardson
Cassie J. Dallas
Thompson, Coe, Cousins, & Irons, L.L.P.

By: *<u>/s/ Avi Moshenberg</u>*
Avi Moshenberg
Attorney of Record for Appellant

## Statement Regarding Oral Argument

Plaintiff, Appellant/Cross-Appellee, Christopher Ferguson respectfully requests oral argument. Given the complexities of this case, oral argument will aid the Court in reaching its decision.

# TABLE OF CONTENTS

Certificate of Interested Persons ........................................................ ii

Statement Regarding Oral Argument ................................................ iv

Table of Contents ........................................................................... v

Table of Authorities ........................................................................ ix

Jurisdictional Statement ................................................................... 1

Issues Presented ............................................................................... 2

Statement of the Case ...................................................................... 3

I. Farm Bureau operates through a pyramid structure where it classifies its agents and Agency Managers as contractors. ........... 3

II. Agents mainly solicit new customers and service policyholders for their assigned insurance agencies. ................................................ 5

III. Farm Bureau's Agency Managers primarily manage their assigned insurance agencies. ........................................................ 6

IV. In 2017, Ferguson sues under the FLSA to recover overtime pay he was denied. ........................................................................ 7

V. The trial court holds on summary judgment that the Agency Managers are nonexempt FLSA employees. .................................. 8

VI. Before trial, the court excludes testimony on pay and from Farm Bureau's undisclosed witnesses. ................................................... 10

VII. The district court holds a trial over the remaining issues in the case. ........................................................................................ 14

1. During opening statements, Farm Bureau injects the Agency Managers' income into the case. ............................................. 15

2. Agency Manager Ricky Martin testifies about his overtime worked, and Farm Bureau dwells on his pay............................ 16

3. Brandon Wheeler testifies about his overtime worked, and Farm Bureau hammers his income. .................................................. 19

4. Mike Cook testifies about his overtime, and Farm Bureau introduces evidence of income................................................. 21

5. Gary Beakley testifies about his overtime, and Farm Bureau focuses on his income................................................................ 22

6. Connie Lovelady testifies about her overtime worked, and Farm Bureau fixates on her income. ................................................. 22

7. Lloyd McCord testifies about his regular overtime, and Farm Bureau aims at his income...................................................... 24

8. Daryl Blackwell testifies about his overtime worked, and Farm Bureau turns to his income..................................................... 25

9. Matt Stanton testifies about this regular overtime, and Farm Bureau crosses him on his income.......................................... 26

10. Christopher Ferguson testifies about his overtime, and Farm Bureau introduces evidence of his income. .............................. 27

11. David Henry testifies about his routine overtime, and Farm Bureau turns to his income.................................................... 28

12. Brandon Peek testifies about this overtime, and Farm Bureau asks about his income............................................................... 29

13. Associate State Sales Director Justin Ingram testifies about the Agency Managers' substantial pay. ......................................... 30

14. Joan Day testifies as an impeachment witness about hours worked. .......................................................................................... 32

15. Farm Bureau calls Mary Pearson as an impeachment witness to dispute hours worked. .......... 35

16. Shannon Gannaway testifies as an impeachment witness about hours worked .......... 36

17. The jury finds that the Agency Managers did not prove they worked over 40 hours a week. .......... 38

VIII. The trial court denies Merritt's Rule 50(b) and 59 motions. ... 38

Summary of the Argument .......... 39

Standard of Review .......... 42

Arguments & Authorities .......... 43

I. The trial court erred in letting undisclosed witnesses testify about hours worked under the impeachment exception .......... 43

1. Rule 26's impeachment exception applies only to evidence used "solely for impeachment"—meaning evidence with any substantive value must be disclosed .......... 44

2. Admitting this evidence was harmful and requires reversal. . 49

II. The court erred in admitting evidence of the Agency Managers' high earnings because their earnings are irrelevant and highly prejudicial. .......... 53

1. Earnings evidence is irrelevant. .......... 54

2. The earnings evidence was unfairly prejudicial. .......... 63

3. Admitting earnings was harmful and requires reversal .......... 66

III. Farm Bureau failed to meet its burden to disprove that the Agency Managers worked overtime. .......... 67

1. Farm Bureau presented no witnesses with personal knowledge of the work schedules of Beakley, Blackwell, Henry, Lovelady, Peek, and Wheeler. .......... 72

2. Farm Bureau's witnesses did not disprove any of the Agency Managers' overtime estimates. .......... 75

A. Farm Bureau failed to disprove the overtime estimates of Matt Stanton. .......... 76

B. Farm Bureau failed to disprove the overtime estimates of Christopher Ferguson. .......... 79

C. Farm Bureau failed to disprove the overtime estimates of Mike Cook. .......... 81

D. Farm Bureau failed to disprove the overtime estimates of Ricky Martin. .......... 83

Conclusion .......... 86

Certificate of Service .......... 87

Certificate of Compliance .......... 87

## TABLE OF AUTHORITIES

### CASES

#### *United States Supreme Court*

*Anderson v. Mt. Clemens Pottery Co.*
328 U.S. 680 (1946) .......... passim
*Helix Energy Sols. Group, Inc. v. Hewitt*
598 U.S. 39 (2023) .......... 9, 66
*Marx v. Gen. Revenue Corp.*
568 U.S. 371 (2013) .......... 48
*McLaughlin v. Richland Shoe Co.*
486 U.S. 128 (1988) .......... 68, 71
*Powerex Corp. v. Reliant Energy Servs., Inc.*
551 U.S. 224 (2007) .......... 48

#### *United States Court of Appeals for the Fifth Circuit*

*Beliz v. W.H. McLeod & Sons Packing Co.*
765 F.2d 1317 (5th Cir. 1985) .......... 71
*Carlson v. Bioremedi Therapeutic Sys., Inc.*
822 F.3d 194 (5th Cir. 2016) .......... 51
*Chiasson v. Zapata Gulf Marine Corp.*
988 F.2d 513 (5th Cir. 1993) .......... 45, 46, 50
*Cox v. Brookshire Grocery Co.*
919 F.2d 354 (5th Cir. 1990) .......... 61
*Flores v. FS Blinds, L.L.C.*
73 F.4th 356 (5th Cir. 2023) .......... 69, 74
*Gibson, Inc. v. Armadillo Distribution Enters., Inc.*

107 F.4th 441 (5th Cir. 2024) ........................................................ 42

*Harmon v. Collie*
158 F.4th 595 (5th Cir. 2025) ........................................................ 42

*Hobbs v. EVO Inc.*
7 F.4th 241 (5th Cir. 2021) ........................................................ 69, 70

*Irons v. Aircraft Serv. Int'l, Inc.*
392 F. App'x 305 (5th Cir. 2010)................................................... 42

*Jauch v. Corley*
830 F.2d 47 (5th Cir. 1987) .......................................................... 49

*Karna v. BP Corp. N. Am.*
609 F. App'x 814 (5th Cir. 2015)................................................... 46

*Olivarez v. GEO Group, Inc.*
844 F.3d 200 (5th Cir. 2016) ................................................... 45, 46

*Sartin v. Wal-Mart Stores, Inc.*
207 F.3d 658 (5th Cir. 2000) ........................................................ 46

*Swearingen v. Gillar Home Health Care, LP*
No. 17-20600, 2019 WL 177959 (5th Cir. 2019)............................ 51

*United States Dep't of Labor v. Five Star Automatic Fire Prot., L.L.C.*
987 F.3d 436 (5th Cir. 2021) ........................................................ 69

*United States v. Allison*
474 F.2d 286 (5th Cir. 1973) ........................................................ 56

*United States v. Arledge*
553 F.3d 881 (5th Cir. 2008) ........................................................ 64

*United States v. Fields*
483 F.3d 313 (5th Cir. 2007) ........................................................ 66

*United States v. Hall*
653 F.2d 1002 (5th Cir. 1981) ................................................. 55, 56

*Williams v. Bd. of Regents of Univ. Sys. of Georgia*
629 F.2d 993 (5th Cir. 1980) .......................................................... 55

***Other United States Courts of Appeals***

*Bledsoe v. Wirtz*
384 F.2d 767 (10th Cir. 1967) ........................................................ 71
*Martin v. Selker Bros., Inc.*
949 F.2d 1286 (3d Cir. 1991)........................................................... 71

***United States District Courts***

*Acosta v. Cent. Laundry, Inc.*
No. 17-4688, 2019 WL 3413514 (E.D. Pa. July 29, 2019) ............ 72
*Ainsworth v. Gildea*
No. 3:08-cv-690, 2010 WL 4007320 (S.D. Miss. Oct. 12, 2010) .... 65
*Diamond Resorts Int'l, Inc. v. Aaronson*
No. 6:17-cv-1394, 2019 WL 1974833 (M.D. Fla. Mar. 13, 2019) .. 13
*Martinez v. State Farm Mut. Auto. Ins. Co.*
No. 96-2478, 1998 WL 414020 (E.D. La. July 21, 1998) .............. 49
*Noviello v. Holloway Funding Group*
No. 3:22-cv-566, 2023 WL 2195768 (N.D. Tex. Feb. 23, 2023)..... 64
*Owens v. Shelter Mut. Ins. Co.*
No. 3:23-cv-423, 2024 WL 2625992 (S.D. Miss. May 24, 2024).... 65
*St. Andrews Presbyterian Church Lake Charles v. Church Mut. Ins. Co.*
No. 2:21-cv-2588, 2022 WL 20689744 (W.D. La. Nov. 4, 2022) ... 65
*Wilkins v. Just Energy Group, Inc.*
No. 19-cv-01367, 2019 WL 13251179 (N.D. Ill. Aug. 4, 2019)...... 56

### Statutes

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

29 U.S.C. § 201 et seq. (Fair Labor Standards Act) .......... passim

### Rules

Fed. R. App. P. 32 .......... 87

Fed. R. Civ. P. 26 .......... passim

Fed. R. Evid. 401 .......... 54

Fed. R. Evid. 402 .......... 54

Fed. R. Evid. 403 .......... 64

## JURISDICTIONAL STATEMENT

The district court exercised federal-question jurisdiction because the claims at issue here involve the federal Fair Labor Standards Act. *See* 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291 because the final judgment disposes of all parties' claims, and Ferguson filed a timely notice of appeal.

## ISSUES PRESENTED

***Issue 1—Improper use of Impeachment Exception***

Under Rule 26, a party need not disclose a witness only if the witness will be used "solely for impeachment." In a lawsuit about overtime hours worked, Farm Bureau failed to disclose several employees who worked with the Plaintiffs. The district court therefore excluded them from testifying substantively. But the court then let these same witnesses testify about the hours the Plaintiffs worked to impeach Plaintiffs' testimony about their overtime hours. Did the trial court err in admitting this substantive evidence through Rule 26's impeachment exception?

***Issue 2—Improper Admission of High Earnings Evidence***

Evidence is inadmissible if it's irrelevant or if its probative value is substantially outweighed by the danger of unfair prejudice. Here the issues at trial were about the number of hours Plaintiffs worked, whether Farm Bureau had notice of those hours, and whether Farm Bureau willfully flouted the FLSA when it misclassified Plaintiffs as independent contractors. None of these issues turned on how well Farm Bureau paid the Plaintiffs. So did the trial court err by admitting repeated evidence that Plaintiffs earned substantial incomes, including six-figure commissions and post-termination payments?

***Issue 3—Failure to Disprove Overtime Hours Worked***

Under *Mt. Clemens*, when an employer fails to keep required time records, the burden shifts to the employer to disprove the employee's reasonable estimate of hours worked. Farm Bureau kept no time records, and the Agency Managers testified that they regularly worked overtime. Did Farm Bureau fail to carry its burden as a matter of law—where its witnesses had no personal knowledge of hours worked outside the office and could testify only to limited observations of time spent inside the office?

## STATEMENT OF THE CASE

This is a Fair Labor Standards Act case for a group of Farm Bureau[1] insurance-agency managers who were misclassified as independent contractors and thus not paid overtime pay for overtime worked.[2]

### I. Farm Bureau operates through a pyramid structure where it classifies its agents and Agency Managers as contractors.

Farm Bureau is a collection of insurance companies that offers products including auto, home/property, farm/ranch, and life insurance.[3] It uses a pyramid system to organize its insurance-sales operation:

---

[1] Specifically, Texas Farm Bureau Casualty Insurance Company, Texas Farm Bureau Mutual Insurance Company, Texas Farm Bureau Underwriters, Farm Bureau County Mutual Insurance Company of Texas, Southern Farm Bureau Life Insurance Company.

[2] ROA.6478 (¶ 2).

[3] ROA.6483–6484 (¶ 20).




Farm Bureau's Sales Department comprises Farm Bureau's Vice President, two Associate State Sales Directors, and a District Sales Manager for each of eight geographic districts.[4] Only agents and Agency Managers are classified by Farm Bureau as independent contractors.[5]

Texas Farm Bureau doesn't recall why it classified the Agency Managers as independent contractors, which apparently happened sometime back in the 1950s.[6] It can't recall whether that decision was based on a 50–state survey of the caselaw, the flip of a coin, or an intentional decision to shirk the FLSA. Southern Farm Bureau relies

[4] ROA.6761 (6:3–15), 6765–6766 (25, 28, 29–30), 6478 (¶ 4).

[5] ROA.6879 (202), 6903 (15), 6650 (203–04).

[6] ROA.6618–6619 (74–81), 6657–6660 (233–43), 6666 (269), 6733 (188–89).

solely on the existence of the contract for its decision.[7] Since classifying the Agency Managers as independent contractors, however, Farm Bureau hasn't looked back. Until the Agency Managers sued Farm Bureau for unpaid overtime in 2017, Farm Bureau had not done any sort of review or analysis to determine whether Agency Managers are properly classified, and as of trial they still had not.[8]

## II. Agents mainly solicit new customers and service policyholders for their assigned insurance agencies.

Agency Managers start with Farm Bureau as insurance agents.[9] Agents primarily solicit customers to buy insurance products and service its policyholders in their assigned counties.[10] Agents sign standard contracts that make them "captive" to Farm Bureau—meaning they can sell only Farm Bureau insurance or third-party insurance Farm Bureau approves.[11] Farm Bureau pays agents commissions for sales that result

[7] ROA.6733–6734 (186–92).

[8] ROA.6618–6619 (74–81), 6659–6660 (240–43), 6733 (188–89), 26891.

[9] ROA.6978 (79–80), 6789 (p. 121), 6855 (p. 109), 6928 (115).

[10] ROA.6991 (132), 6836 (30–32).

[11] ROA.6761 (8–9), 6837–6838 (37–38), 6985 (108), 7040 (132–33), 6720 (134–37), 7125 (58).

from their solicitations and renewal commissions when policies assigned to them renew.[12]

## III. Farm Bureau's Agency Managers primarily manage their assigned insurance agencies.

Agency Managers oversee the agents assigned to the agencies they manage.[13] The Agency Managers manage their assigned agencies (which cover a county or group of counties) to meet Farm Bureau's expectations.[14] Their top responsibilities for doing this are recruiting, training, and supervising Farm Bureau agents.[15]

The Agency Managers signed standard contracts.[16] These contracts provide that they are captive independent contractors.[17] Agency Managers can earn direct sales and renewal commissions.[18] Because

---

[12] ROA.6830 (7–8).

[13] ROA.6772, 6784–6785 (51, 101–04), 6764 (18), 6913, 6932 (56, 132), 7037–7038 (121–22), 6965 (26).

[14] ROA.6784 (100–01), 6799 (158–60), 6981, 6991 (91, 132), 7133 (90); 6705 (74–76), 6963 (18).

[15] ROA.7015 (30–31), 6833 (18–20), 6786 (pp. 103–04), 6981, 6983 (91, 101), 6797 (158–60), 6706 (78–79).

[16] *See, e.g.*, ROA.899.

[17] ROA.6642 (8–9), 6718–6719 (37–38), 6541 (108), 6958 (132–33), 6604 (134–37), 6537 (207–08).

[18] ROA.6711 (7–9), 6523–6524 (153–54).

their opportunities for direct sales are significantly diminished, however, they also earn overwrite commissions from the sales and renewals of the agents they manage.[19]

## IV. In 2017, Ferguson sues under the FLSA to recover overtime pay he was denied.

In April 2017, Christopher Ferguson, a former Farm Bureau Agency Manager, brought this action on behalf of himself and similarly situated Agency Managers.[20] A year later the trial court conditionally certified the case as a collective action.[21] Several other Agency Managers then opted into the case.[22]

Through years of hard-fought litigation, Farm Bureau contested its liability on nearly every front. It argued that the Agency Managers were independent contractors; that they were exempt under the FLSA's administrative, executive, and highly compensated employee (also known as the "EAP" or "white collar") exemptions, the outside-sales

[19] ROA. 6711 (7–9), 7073 (90), 6995 (40).

[20] ROA.123–124 (¶ 1–3).

[21] ROA.2685–2686, 2690–2692.

[22] ROA.2842, 2844, 2846, 2848, 2900, 2902.

exemption, and the § 207(i) retail/commission exemption; that the managers had waived FLSA coverage, were estopped from claiming overtime, and that contractual post-termination payments should offset unpaid overtime; and, finally, even if Farm Bureau was liable, it had misclassified the workers in good faith.[23]

The Agency Managers moved for summary judgment on these issues.[24] Farm Bureau also moved for summary judgment on the white-collar exemptions, insisting the Agency Managers were exempt because they made more than $100,000 annually and performed some exempt duties.[25] The Agency Managers pointed out, however, that the white-collar exemptions couldn't apply because they were not paid on a salary basis.[26]

## V. The trial court holds on summary judgment that the Agency Managers are nonexempt FLSA employees.

[23] ROA.8409, 8415, 17307, 17309, 10484, 17326, 20235.

[24] ROA.5826, 6059, 6123, 7353, 6431, 20197.

[25] ROA.17278.

[26] ROA.17301–17303, 24996.

In May 2021, the trial court granted the Agency Managers' summary-judgment motions except on the white-collar exemptions.[27] The trial court determined as a matter of law that: the Agency Managers were FLSA employees, the outside-sales exemption did not apply, Farm Bureau's equitable defenses were inapplicable, and Farm Bureau's claim of good faith failed was totally unsupported by evidence.[28]

In August 2024, after the Supreme Court decided *Hewitt*,[29] the trial court entered summary judgment against Farm Bureau on the white-collar exemptions.[30] The court agreed that, under *Hewitt*, Farm Bureau did not pay its Agency Managers on a salary basis.[31] In other words, the amount of money the Agency Managers were paid—though substantial—was irrelevant to whether they were entitled to receive overtime pay for overtime worked. The trial court also granted the

[27] ROA.14346–14347.

[28] ROA.14346–14347.

[29] *Helix Energy Sols. Group, Inc. v. Hewitt,* 598 U.S. 39, (2023).

[30] ROA.21763.

[31] ROA.21760–21761.

Agency Managers' summary-judgment motion on the retail/commission exemption.[32]

These summary judgments left few issues for trial: (1) how much, if any, overtime hours the Agency Managers worked, (2) whether Farm Bureau was on notice that the Agency Managers worked overtime, and (3) whether Farm Bureau willfully misclassified the Agency Managers as independent contractors instead of as employees.[33]

## VI. Before trial, the court excludes testimony on pay and from Farm Bureau's undisclosed witnesses.

At the final pretrial conference, the Agency Managers moved to exclude the amount of their income from the jury's consideration at trial. They argued that "how much money [the Agency Managers] made has no bearing on … the amount of time they worked, whether or not they knew they were working overtime, or whether or not they were misclassified."[34] The Agency Managers likewise emphasized the prejudicial nature of the evidence in question and pointed out the risk of

[32] ROA.21763–21764.

[33] ROA.24742–24743.

[34] ROA.24638.

encouraging the jury to "rule not on the merits, but out of anger, resentment, or indignation":

> the background. It really is the most prejudicial fact. If you'll recall the drum beat of how much Mr. Merritt made was beat repeatedly in that case.
>
> This is the single most prejudicial thing, and it really has no bearing. And if it had even the tiniest bit of bearing, it is outweighed by that risk of angering and inflaming the jury.

[35]

The court granted the Agency Managers' motion, in part—requiring "the defendants to approach before getting into the plaintiffs' total income in a calendar year" along with "the equivalent of the plaintiffs' financial size or net worth."[36] On the Agency Managers' motion regarding "argument, reference, or evidence of Plaintiffs' income," the court granted it "as to total income during a calendar year" and denied it "as to commissions, expenses, and similar items.

[35] ROA.24639–24640.

[36] ROA.24644–24645.

| | | | |
|---|---|---|---|
| 2 | Any argument, reference, or evidence of Plaintiffs' income. | **GRANTED** as to total income during a calendar year. | **DENIED** as to commissions, expenses, and similar items. |

[37]

The Agency Managers also moved to strike 20 witnesses on Farm Bureau's witness list because they were not disclosed before the discovery deadline or were disclosed mere days before the deadline:

> MR. MOSHENBERG: There are witnesses on their list, the vast majority of whom were never disclosed under Rule 26 disclosures, as people they may rely on at trial to support their claims and defenses.
>
> They are also individuals who were disclosed just days before the discovery deadline expired.
>
> Both of those, in our view, ought to be struck.

[38]

The Agency Managers continued by detailing every witness that Farm Bureau did not disclose before the deadline or disclosed just before the deadline.[39] Nine of those witnesses were withdrawn from Farm Bureau's list.[40]

---

[37] ROA.21749.

[38] ROA.24729.

[39] ROA.24730–24735.

[40] ROA.24731–24735.

The court ultimately issued an order where it overruled the objections to nine of the witnesses.[41] But it held that as to eight witnesses that Farm Bureau only 'disclosed' during Plaintiffs' depositions, that the disclosure was insufficient to "make clear not only that the witness existed and had information, but also that the party intended to use that witness to support its claims or defenses."[42] As a result, the court sustained the Agency Managers' objections to Farm Bureau calling these witnesses to testify substantively at trial and, instead, only allowed them to testify for impeachment purposes.

Mar. 13, 2019). Defendants should not be permitted to call these witnesses to support their

---

[41] ROA.22239.

[42] ROA.22239 (quoting *Diamond Resorts Intl., Inc. v. Aaronson*, No. 617CV1394ORL37DCI, 2019 WL 1974833, at *2 (M.D. Fla. Mar. 13, 2019)).

> claims or defenses. Nonetheless, Rule 26 does not preclude Defendants from calling these witnesses for impeachment purposes. *See* Fed. R. Civ. P. 26 (a)(3). Thus, Plaintiffs' objections are **SUSTAINED** as to the following witnesses, other than for impeachment purposes:
>
> - Roger Havel
> - Brenda Williams Aguilar
> - Rich Rudisale
> - Sabrina Baker
> - Joan Day
> - Brenda Martin
> - Shannon Gannaway
> - Mary Pearson
>
> SIGNED this 30th day of August, 2024.

[43]

## VII. The district court holds a trial over the remaining issues in the case.

Immediately before the trial began, the Agency Managers again raised the admissibility of their income.[44] Having conferred with counsel for Farm Bureau, they believed Farm Bureau intended to introduce income figures at trial.[45] The Agency Managers stressed that admitting evidence of income amounts would be unfairly prejudicial:

---

[43] ROA.22238–22240.

[44] ROA.24758–24759.

[45] ROA.24759.

> More importantly, the whole issue here is they want to put up a big number and tell the jury these people made a lot of money. And maybe we'll only show you one shareholder distribution that's a lot, and let the jury sort of speculate as to how much the total comp was.
>
> All we're saying is the dollar figure should be out; that they received shareholder distributions, that they received commissions, that they accepted commissions, that they signed the contract. All of these things we are accepting at this stage, at the limine stage, we're fine with not limining out.
>
> What we're focused on is the dollar value of the compensation because it is highly prejudicial.

[46]

But the court allowed evidence of the amount of compensation—so long as Farm Bureau didn't present gross amounts that let the jury easily determine plaintiffs' total pay.[47] In other words, Farm Bureau could set a floor for the Agency Managers' pay and allow the jury to speculate on just how much they actually earned.

1. **During opening statements, Farm Bureau injects the Agency Managers' income into the case.**

---

[46] ROA.24762.

[47] ROA.24762–24763.

In its opening statement, Farm Bureau—over the Agency Managers' objection—introduced that the Agency Mangers will receive post-termination payments amounting to hundreds of thousands of dollars.[48] The Agency Managers pointed out that Farm Bureau's statement violated the in-limine order.[49] The court nonetheless let Farm Bureau hammer how much money the Agency Mangers made.[50] So Farm Bureau continued to focus on the Agency Managers' compensation. It even ended its opening by telling the jury that the Agency Managers had already been paid twice for their work and they should not be paid a third time.[51] The court overruled the Agency Managers' objection to Farm Bureau's statements.[52]

This was only the beginning.

**2. Agency Manager Ricky Martin testifies about his overtime worked, and Farm Bureau dwells on his pay.**

[48] ROA.24795–24796.

[49] ROA.24796.

[50] ROA.24796.

[51] ROA.24806.

[52] ROA.24806.

On the first day of trial, the Agency Managers called their first witness, Ricky Martin, to the stand. He testified that his typical workweek exceeded 60 hours and that he worked from 7 a.m. to 7 or 8 p.m. almost daily.[53] He also detailed all the work that caused him to work such long hours.[54]

On cross, Farm Bureau asked Martin about the part in his contracts titled "Payments After Termination" and the fact that he continued to receive post-termination payments.[55] The Agency Managers objected.[56] But the court overruled it.[57] After Farm Bureau asked about the specific amounts Martin was being paid under the contract before they were admitted into evidence, counsel for the Agency Managers objected and approached the bench to argue to the court in detail:

---

[53] ROA.24812.

[54] ROA.24828–24829, 24831, 24833–24834, 24836–24837, 24838–24839, 24883–24884, 24893–24894, 24898–24898.

[55] ROA.24924–24925.

[56] ROA.24925.

[57] ROA.24925.

MR. MOSHENBERG: So, first of all, this is more of an aside point. I'm going to repeat the objection about termination payments. I don't think they're relevant at all to the time period.

But separate and apart from that, this goes to the same point as the limine on income. There's no reason the jury needs to know the amount that they received. They can redact it.

It has nothing to do with the case, the amount of termination payments they received after he stopped working at Farm Bureau. All they're trying to do is show that dollar amount to tell the jury he got paid enough, even though that's not the law, Judge. And they're not going to be instructed that he got paid enough.

In fact, Judge Manske and Judge Albright said, You can't argue he got paid enough. If he's entitled to overtime, he gets it.

So at the very least, they need to redact all those dollar amounts. But I don't think any of it should come in. It's not relevant and it's prejudicial.

[58]

The court ultimately overruled the objection and claimed that the motion in limine pertained to "the gross amount, the big numbers."[59]

Then Farm Bureau asked whether Martin's payments continued until 2027, whether he received $1,800–$1,900 a month, and what his

---

58 ROA.24926–24927.

59 ROA.24926–24927.

monthly pay amounted to annually.[60] The plaintiffs objected.[61] The court overruled two objections, but sustained one that Farm Bureau was attempting to offer the total amount Martin received a year.[62]

Farm Bureau then turned to Martin's tax returns. The Agency Managers objected and argued that the returns showed his total compensation, his expenses, and his net income such that the jury could infer he made at least $84,000 that year.[63] While the court sustained the objection it nevertheless allowed Farm Bureau to ask about the return and generally how voluminous the expenses he deducted were (tens of thousands or hundreds of thousands of dollars for instance).[64]

**3. Brandon Wheeler testifies about his overtime worked, and Farm Bureau hammers his income.**

[60] ROA.24928–24930

[61] ROA.24929–24930.

[62] ROA.24929–24930.

[63] ROA.24957–24958

[64] ROA.24958–24959.

Brandon Wheeler was an agency manager with Farm Bureau for 14 years.[65] He testified that he usually worked 55 hours per week.[66] He also testified that he believed Farm Bureau's District Sales Managers knew what work agency managers did because they regularly reported their work activities.[67]

The court allowed Farm Bureau to ask Wheeler about his income and paint him as some who's handsomely paid. Farm Bureau suggested in questioning that Wheeler was "making a ton of money" and asked whether he considered a six-figure salary to be "good money."[68] The Agency Managers objected, but the court allowed Farm Bureau to "ask in generalities, but not the specifics."[69] Farm Bureau then hinted at specific figures by asking—over the Agency Managers' objection—if more

---

[65] ROA.25001.

[66] ROA.25001, 25004–25006, 25010, 25018–25019, 25020–25021, 25013–25017, 25021.

[67] ROA.25027–25028.

[68] ROA.25101.

[69] ROA.25101.

than $150,000 or $200,000 a year in commissions was "a good living" and a lot of money.[70]

#### 4. Mike Cook testifies about his overtime, and Farm Bureau introduces evidence of income.

Mike Cook worked for Farm Bureau from 1987 to 2019.[71] Cook described how he worked 45–50 hours per week.[72] And he too described all the work that resulted in such hours.[73]

On cross, Farm Bureau asked whether he used thousands of dollars in expense reductions to reduce his income-tax liability.[74] The court then admitted Cook's post-termination pay statement showing his monthly pay even after leaving Farm Bureau.[75]

#### 5. Gary Beakley testifies about his overtime, and Farm Bureau focuses on his income.

[70] ROA.25102–25104.

[71] ROA.25152–25153.

[72] ROA.25166.

[73] ROA.25160–25161, 25163–66.

[74] ROA.25222.

[75] ROA.25230.

Gary Beakley described how he worked 50 hours or more per week as an Agency Manager for nine years.[76] He also described his working conditions and the duties that required him to work overtime regularly.[77]

During cross-examination, Farm Bureau questioned Beakley about his pay.[78] The court admitted an exhibit that detailed Beakley's post-termination payments (which listed a monthly dollar amount of $2,575.34).[79] And it asked if Beakley liked the amount he got paid, implying his income was high.[80]

### 6. Connie Lovelady testifies about her overtime worked, and Farm Bureau fixates on her income.

Connie Lovelady worked as an agency manager from 1992 until 2014.[81] Lovelady testified that she typically worked 50–55 hours per week at least.[82] She then testified about her working conditions, her

[76] ROA.25272, 25283.

[77] ROA.25262–25266, 25269–25272.

[78] ROA.25307–25308.

[79] ROA.25313.

[80] ROA.25317

[81] ROA.25317

[82] ROA.25346.

routine, and the responsibilities that came with her job that all contributed to her regular overtime.[83]

And on cross, Farm Bureau questioned Lovelady about her income. Farm Bureau asked whether her monthly buyout payments amounted to $3,951.22 for two years and $3,094.09 for eight years.[84] Farm Bureau followed up by asking if she'd been paid $3,094 per month for a period of 10 years.[85] Farm Bureau then asked, and the court permitted the question, of whether she was "highly paid" for her as an agency manager:

> **Q** Fair to say that you were highly paid for the work you described with Mr. Cook performing as an agency manager, correct?
>
> MR. COOK: Objection. Relevance. 403.
>
> THE COURT: Overruled. I'll allow an answer to the question.

[86]

Farm Bureau also used her to tell the jury that the post-termination payments "are just a portion of the monthly payments and

83 ROA.25338–25350.

84 ROA.25357.

85 ROA.25358–25359.

86 ROA.25382.

commissions you received from Texas Farm Bureau during your tenure."[87]

**7. Lloyd McCord testifies about his regular overtime, and Farm Bureau aims at his income.**

Lloyd McCord worked as an Agency Manager from 1981 to 2014 and testified that he regularly worked 60–65 hours per week.[88] Like the other Agency Managers, he testified about the routine, job conditions, and demands that resulted in his regular overtime.[89]

Then on cross, McCord was asked, and the court allowed testimony, as to whether he was "highly compensated" and that he was paid "six figures."[90]

Farm Bureau later tried to preview the testimony of a witness the court had previously excluded. It asked McCord what he'd say if a secretary testified that it was not true that he worked over 40 hours a

[87] ROA.25383

[88] ROA.25386–25387, 25397.

[89] ROA.23587–23591, 25393–24394, 25396–25397, 25400–25403, 25417.

[90] ROA.25417.

week.[91] Counsel objected to this attempt to admit excluded testimony through a different witness, but the court allowed it.[92]

#### 8. Daryl Blackwell testifies about his overtime worked, and Farm Bureau turns to his income.

Daryl Blackwell was an agency manager with Farm Bureau from 1988–2016.[93] Blackwell testified that he worked 50–55 hours per week.[94] He then walked the jury through his daily routine, his job duties, and overall working conditions that resulted in frequent overtime.[95]

On cross, Farm Bureau injected Blackwell's high earnings, questioning him about making "good money."[96] It also asked about his making "a lot of money" from certain commissions.[97]

#### 9. Matt Stanton testifies about this regular overtime, and Farm Bureau crosses him on his income.

---

[91] ROA.25432.

[92] ROA.25432.

[93] ROA.25451–25452.

[94] ROA.25474.

[95] ROA.25455–25456, 25450, 25460–25461, 25462–25466.

[96] ROA.25487.

[97] ROA.25503–25504.

Matt Stanton testified he worked as an agency manager for Farm Bureau from 1998 until 2017.[98] Stanton testified that he worked about 55 hours per week.[99] Stanton, like the others, detailed the conditions that resulted in him working so much overtime.[100]

During cross, Farm Bureau again asked about monthly post-termination-payments amounts over the Agency Managers' objections:

> **Q** Okay. All right. Since your retirement at the end of March of 2016, you have received post-termination payments from the Farm Bureau companies, correct?
>
> **A** Yes.
>
> **Q** That amount from Texas Farm Bureau was $1,000 -- $1,091 a month, correct?
>
> MR. MOSHENBERG: Objection, Judge. 402, 403.
>
> THE COURT: Overruled. I'm allow it.

[101]

### 10. Christopher Ferguson testifies about his overtime, and Farm Bureau introduces evidence of his income.

---

98 ROA.25511–25512.

99 ROA.25516.

100 ROA.25516–25527.

101 ROA.25625.

Christopher Ferguson testified he worked as an agency manager for Farm Bureau from 2009 to 2016.[102] He testified that he regularly worked 50–55 hours weekly.[103] He too walked the jury through the routine, working conditions, and job duties that caused him to work overtime regularly.[104]

During cross-examination, Farm Bureau fixated on Ferguson's income. It asked about shareholder distributions to his company, Christopher Ferguson Insurance Services Inc.[105] It first established that those distributions were made up entirely of Farm Bureau commission income.[106] Then pointed out that when those distributions were paid, they could be hundreds of thousands of dollars.[107]

---

[102] ROA.25657, 25661–25662.

[103] ROA.25671.

[104] ROA. 25663–25664, 25677, 25680–25681, 25686–25688.

[105] ROA.25722.

[106] ROA. 25722.

[107] ROA.25723.

Farm Bureau then delved into Ferguson's post-termination payments.[108] The court admitted an exhibit reflecting these payments and Farm Bureau asked about the $2,200 monthly amount listed.[109]

#### 11. David Henry testifies about his routine overtime, and Farm Bureau turns to his income.

David Henry testified he was an agency manager at Farm Bureau from 1998 until 2016.[110] He testified that he worked 45–50 hours and detailed the working conditions that supported this estimate.[111]

On cross, the court admitted a statement reflecting his post-termination payments, again over the Agency Managers' objection:

---

[108] ROA.25749.

[109] ROA.25749–25750.

[110] ROA.25783.

[111] ROA.25790, 25783–25786, 25788–25795.

Q All right. Thank you.
And this is an agency manager termination payment, correct?
A Correct.
Q And this reflects a pay date of July 31st of 2024?
A Yes, sir.
Q Okay.
MR. MOSCOWITZ: Your Honor, we'd move to admit Defendants' Exhibit 1251.
MR. LAWSON: Objection. 402 and 403.
THE COURT: All right. Objection is overruled.
[112]

### 12. Brandon Peek testifies about this overtime, and Farm Bureau asks about his income.

Brandon Peek was an agency manager from 2009 to 2016, and testified he worked 50–55 hours per week.[113] Like the others, he also detailed his routine, working conditions, and job duties that resulted in him working so much overtime regularly.[114]

And Farm Bureau injected his income into its cross. Farm Bureau asked Peek if he liked getting paid commissions given that it can result in getting paid a significant amount of money, and, ultimately, if he was

---

[112] ROA.25812–25813.

[113] ROA.25829, 25842.

[114] ROA.25830–25839.

well compensated—all over relevance and unfair-prejudice objections.[115] Farm Bureau then asked Peek if he considered six figures well-compensated—again over the Agency Managers' objections.[116] And again, the court admitted Peek's post-termination payments over the same objections.[117]

#### 13. Associate State Sales Director Justin Ingram testifies about the Agency Managers' substantial pay.

When Farm Bureau called its first witness, it called Justin Ingram. Ingram is an Associate State Sales Director for Farm Bureau.[118] Ingram managed three of the plaintiffs: David Henry, Darrell Beakley, and Chris Ferguson and previously worked for Farm Bureau as an agency manager.[119]

The defendants capped their direct of Ingram by dwelling on the Agency Managers' substantial income.[120] When Farm Bureau asked him

[115] ROA.25857–25858.

[116] ROA.25857.

[117] ROA.25863–25865.

[118] ROA.26168.

[119] ROA.26169–26170.

[120] ROA.26225.

if any current agency managers with the company ever told him they wanted to become employees,[121] Ingram ended his answer by explaining that current agency managers like the compensation structure and, on average, *earn $350,000 or $450,000 per year*.[122] The Agency Managers' objected as to relevance and moved to strike.[123] The court sustained their objection and instructed the jury to disregard the statement about average compensation.[124] But, knowing this was a bell that could not be unrung, the Agency Managers then moved for a mistrial, which the court denied:

[121] ROA.26225.

[122] ROA.26225.

[123] ROA.26225.

[124] ROA.26225.

> MR. MOSHENBERG: Objection, Judge. This is 403 issue. Move to strike.
>
> THE COURT: I'll sustain the objection and instruct the jury to disregard the last statement about the average compensation.
>
> MR. MOSHENBERG: And, Judge, may we approach on that issue? Or on another issue, Your Honor?
>
> THE COURT: Quickly.
>
> (Bench discussion.)
>
> MR. COOK: Your Honor, the same issue, given the flagrant violation of the motion in limine, I feel like we have to move for a mistrial.
>
> They've been trying this entire trial to prejudice the [125]

> jury by suggesting that these people make a ton of money. They've done it all around the edges of your ruling. And now they've just come out with a broadside in the middle of the jury.
>
> Your Honor, we would move for mistrial.
>
> THE COURT: Understand, and I'm going to deny the motion for mistrial. [126]

### 14. Joan Day testifies as an impeachment witness about hours worked.

After another witness testified,[127] the parties had a dispute about whether Joan Day could testify next. The Agency Managers urged that

---

[125] ROA.26225.

[126] ROA.26226.

[127] ROA.26323.

Day couldn't, given that the Court had previously excluded her because she had not been timely disclosed.[128] Responding to Farm Bureau's argument that Day could testify as an impeachment witness, the Agency Managers explained that the impeachment exception doesn't apply when the evidence serves both substantive and impeachment purposes:

> MR. MOSHENBERG: Thank you, Judge.
>
> If you read the *Olivarez* case, I think it settles it.
>
> If you've got evidence that's dual purpose, if it's both to discredit the witness but at the same time also touches on the facts of the case, it touches on the substance at issue, the facts that need to be decided by the jury, then that [129]
>
> evidence needs to be turned over. It is not impeachment evidence within the meaning of Rule 26.
>
> It's a Fifth Circuit case from 2016, Your Honor. And it cites cases from the Fifth Circuit, goes, I think, back to the 1980s. This is the settled law. This has always been the standard. If you're going the use impeachment evidence that goes to a fact to be decided by the jury, you've got to provide it in discovery.
>
> In terms of impeachment, one of the questions that they settled last night in their response to our objection is what Ms. Day will talk about. And it's all substance, Your Honor. It has entirely to do with the hours that Mr. Stanton worked, which is an issue to be decided by the jury. [130]

---

[128] ROA.26158.

[129] ROA.26158–26159.

[130] ROA.26159.

The court allowed Day to testify solely as an impeachment witness.[131]

Farm Bureau then called Day, an administrative assistant for the company, to testify.[132] Matt Stanton was her agency manager.[133] And when she testified, the court allowed Farm Bureau to repeatedly ask substantive questions.

Most significantly, Farm Bureau asked a series of questions related to Stanton's work schedule. It first asked Day what days of the week Stanton would be in the office where she worked.[134] Despite this going to the heart of the merits issue in dispute, the court overruled the objection and allowed questions on hours worked.[135] The court also overruled the request for a limiting instruction that the jury consider her testimony on credibility only but not the number of hours he worked.[136] The court overruled the same objection when Farm Bureau asked Day about the

[131] ROA.26167.

[132] ROA.26366.

[133] ROA.26367.

[134] ROA.26369.

[135] ROA.26369.

[136] ROA.26369.

agency's hours,[137] if Stanton had a set schedule as to when he'd come in to work,[138] the number of board meetings held on a yearly basis,[139] when, where, and how long board meetings lasted,[140] and how many times Stanton stayed in the office for more than 15–30 minutes,[141] Stanton's taking underwriting photographs outside the office,[142] and whether he was working with insureds in Dickens County.[143] The court overruled and denied a limiting instruction.[144]

**15. Farm Bureau calls Mary Pearson as an impeachment witness to dispute hours worked.**

Mary Pearson, a former Farm Bureau secretary who worked with McCord, then testified for Farm Bureau.[145] The court previously ruled that she could only testify as an impeachment witness.[146] When asked if

---

[137] ROA.26370–26371.

[138] ROA.26372–23673.

[139] ROA.26374–26375.

[140] ROA.26375–26377.

[141] ROA.26378.

[142] ROA.26380.

[143] ROA.26380–26381.

[144] ROA.26379.

[145] ROA.26523–26524.

[146] ROA.22239–22240.

there was a part of his insurance work that McCord did not do, the Agency Managers objected to the substantive question but the court overruled it and denied their request for a limiting instruction.[147] The court overruled the same objection when she was asked who usually opened the office and if McCord was there when she locked up.[148] When asked if there was any indication McCord came back to the office after she locked up, the court overruled the same objection.[149] The Agency Managers then objected repeatedly to Farm Bureau's line of questioning until the court ultimately granted a running objection regarding McCord's whereabouts and work schedule.[150]

**16. Shannon Gannaway testifies as an impeachment witness about hours worked.**

Farm Bureau also called Shannon Gannaway, a Farm Bureau agent who Ricky Martin managed.[151] She was another witness who was

[147] ROA.26524–26525.

[148] ROA.26525–26526.

[149] ROA.26525–26526.

[150] ROA.26526–26528.

[151] ROA.26537.

previously excluded except for impeachment purposes.[152] Gannaway testified about her recollection of Martin's work schedule, so the Agency Managers objected that her testimony was substantive.[153] The court overruled the objection and denied the plaintiffs' request for a limiting instruction.[154] After Ganaway continued to testify about Martin's schedule, the court granted a running objection to the substantive testimony on the issue of Martin's time spent in the office.[155] The court likewise granted running objections to questions about agency meetings, reviews, and client appointments.[156] Last, the Agency Managers objected to Farm Bureau asking if there was a specific time Gannaway remembered Martin not being in the office.[157] The court overruled the objection.[158]

---

[152] ROA.22239–22240

[153] ROA.26539.

[154] ROA.26539.

[155] ROA.26540–26541.

[156] ROA.26542–26545, 26548.

[157] ROA.26542–26545, 26548.

[158] ROA.26542–26545, 26548.

### 17. The jury finds that the Agency Managers did not prove they worked over 40 hours a week.

After the parties delivered closing arguments, the jury rendered its verdict.[159] With respect to each plaintiff, the jury found that they did not prove they worked over 40 hours in any workweek during the relevant time-period.[160] Given that answer, the jury did not reach any other question.[161]

## VIII. The trial court denies Merritt's Rule 50(b) and 59 motions.

On September 10, 2024, the Court entered a final judgment, ordering that the Agency Managers take nothing.[162] The Agency Managers then moved under Rule 50(b) and Rule 59(a) to vacate that judgment and grant a new trial or render a judgment as a matter of law.[163] On July 18, 2025, the trial court entered a written order denying the Rule 50 and 59 motions.[164] The Agency Managers now appeal.[165]

---

[159] ROA.27093, 26996.

[160] ROA.27093–27094.

[161] ROA.27094.

[162] ROA.23328.

[163] ROA.23694.

[164] ROA.24006.

[165] ROA.24025.

## SUMMARY OF THE ARGUMENT

The Agency Managers were entitled to a trial on the merits. They didn't get one. Three errors infected this trial.

First, the district court let Farm Bureau ambush the Agency Managers with witnesses it never disclosed. The court initially did the right thing—it excluded Joan Day, Mary Pearson, and Shannon Gannaway because Farm Bureau failed to disclose them under Rule 26. But then it let them testify anyway under Rule 26's impeachment exception. That exception doesn't apply here. Under Rule 26, a party need not disclose a witness only if the witness will be used "solely for impeachment." These witnesses testified about the hours the Agency Managers worked—the central issue at trial. That's substantive evidence, not impeachment. And when the Agency Managers objected and requested limiting instructions, the court denied them. The Agency Managers had no opportunity to depose these witnesses, investigate their backgrounds, or prepare to cross-examine them. They were blindsided at trial on the issue that mattered most.

Second, the court let Farm Bureau turn the trial into a referendum on the Agency Managers' wealth. Over repeated objections, Farm Bureau paraded evidence of six-figure commissions, post-termination payments, and lucrative buyouts before the jury. It asked witnesses whether they were "making a ton of money" and whether six figures was "a good living." It introduced exhibits showing monthly buyout payments. One Farm Bureau witness volunteered that the average agency manager earns *$350,000 to $450,000 per year*. This evidence had no bearing on any issue the jury was asked to decide. It didn't prove the Agency Managers worked less than 40 hours. It didn't prove Farm Bureau lacked notice of overtime. It didn't prove Farm Bureau's misclassification was innocent. It proved only that the Agency Managers were well compensated—and invited the jury to conclude they didn't need or deserve overtime pay. That's not a legal defense. It's an appeal to bias. None of the issues at trial provided an exception for well-paid employees. But the district court allowed Farm Bureau to create one by admitting this irrelevant and prejudicial evidence at trial.

Third, the jury's verdict cannot stand because Farm Bureau failed to carry its burden under *Mt. Clemens Pottery*. Because Farm Bureau kept no time records, the burden shifted to it to disprove the Agency Managers' reasonable estimates of hours worked. It didn't. The Agency Managers testified credibly that they regularly worked between 45 and 65 hours per week. They described their routines, their duties, and the demands that caused them to work overtime. Farm Bureau's rebuttal was thin. Its witnesses had no personal knowledge of hours worked outside the office—and Agency Managers were permitted to work anywhere, anytime. For several Plaintiffs, Farm Bureau offered no rebuttal at all. Yet the jury found that none of the Agency Managers worked any overtime in any week. That verdict is untethered from the evidence.

The Agency Managers proved they were employees under the FLSA. They proved they worked overtime. They proved they weren't paid for it. What they didn't get was a fair trial—one decided on the merits rather than on ambush witnesses and inflammatory evidence about wealth. This Court should reverse and remand so they can have one.

## Standard of Review

The first two issues involve the trial court's improper admission of evidence. The third involves its improper denial of a new trial given the lack of evidence supporting the verdict. As to the first two issues, this Court reviews evidentiary rulings for an abuse of discretion.[166] To show an abuse of discretion, the appellant must demonstrate that the evidentiary decision was based on an erroneous view of the law or on a clearly erroneous assessment of the evidence.[167] A ruling that constitutes an abuse of discretion in admitting or excluding evidence will be affirmed under the harmless-error doctrine unless the ruling affected substantial rights of the complaining party.[168] As to the third issue, this Court reviews the denial of a new-trial motion for an abuse of discretion.[169] The district court abuses its discretion by denying a new trial when there's no evidence to support the verdict.[170]

---

[166] *Irons v. Aircraft Serv. Int'l, Inc.*, 392 F. App'x 305, 314 (5th Cir. 2010).

[167] *Gibson, Inc. v. Armadillo Distribution Enters., Inc.*, 107 F.4th 441, 446–47 (5th Cir. 2024), *as revised* (Aug. 8, 2024).

[168] *Id.* at 447.

[169] *Harmon v. Collier*, 158 F.4th 595, 607 (5th Cir. 2025).

[170] *Id.*

## ARGUMENTS & AUTHORITIES

The Court should reverse the trial court's judgment for three reasons. First, the trial court erred when it allowed undisclosed witnesses to testify about the substantive issues in the case under the guise of impeachment. Second, the trial court erred when it allowed prejudicial evidence of the Agency Managers' earnings, when earnings were irrelevant to any issues before the jury. Third, the trial court erred in upholding the jury's finding that the Agency Managers did not work any overtime.

### I. The trial court erred in letting undisclosed witnesses testify about hours worked under the impeachment exception.

The Agency Managers are entitled to a new trial because the district court improperly admitted the substantive testimony of undisclosed witnesses under the impeachment exception. Before trial, the trial court determined that (among others) Joan Day, Mary Pearson, and Shannon Gannaway couldn't testify because Farm Bureau failed to disclose them under Rule 26.[171] But it then let these witnesses testify

[171] *See* ROA.22238–22240; *see also* Fed. R. Civ. P. 26.

under Rule 26's impeachment exception.[172] The witnesses proceeded to testify about the hours, schedule, and job performance of the Agency Managers they worked with.[173] Their testimony went directly to the issue of the Agency Managers' hours worked and whether they worked overtime. Under this Court's precedent, this was an improper impeachment because the impeachment exception doesn't apply to substantive evidence that goes to a material fact at issue.

1. **Rule 26's impeachment exception applies only to evidence used "solely for impeachment"—meaning evidence with any substantive value must be disclosed.**

Because the testimony of Day, Gannaway, and Pearson was not solely for impeachment, the trial court erred in admitting their testimony under Rule 26's impeachment exception. Federal Rule of Civil Procedure 26 required Farm Bureau to disclose witnesses it may call at trial to support its defenses unless their testimony would be "solely for impeachment."[174] Here, the trial court issued an order specifically finding that Farm Bureau had failed to disclose Joan Day, Shannon

[172] ROA.26167, 26523–26524, 26537.

[173] *See* Statement of the Case at §§ VII(14)–(16).

[174] Fed. R. Civ. P. 26(a)(1)(A)(i).

Gannaway, and Mary Pearson.[175] Therefore "Defendants should not be permitted to call these witnesses to support their claims or defenses."[176] But the testimony offered by these witnesses was not merely impeachment, it directly addressed the hours worked by each Agency Manager that the witnesses worked with.

As far back as 1993, this Court distinguished substantive evidence which "is offered to establish the truth of a matter to be determined by the trier of fact" and impeachment evidence which is offered to "discredit a witness" and "reduce the effectiveness" of their testimony by giving reasons why the jury should not trust them.[177] In *Chiasson*, the defendant withheld a surveillance tape of the plaintiff in an injury claim on the grounds it was for impeachment only.[178] But the tape was "at the very least in part substantive" and so "it should have been disclosed prior to trial, regardless of its impeachment value."[179] This Court concluded it

---

[175] ROA.22238–39.

[176] *Id.*

[177] *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993).

[178] *Id.* at 517.

[179] *Id.* at 517–18.

was reversible error to admit the tape because "[i]ts importance [was] obvious."[180]

The difference between substantive and impeachment is also seen in this Court's decision in *Sartin*.[181] There, this Court excluded a surveillance tape of the plaintiff on untimely and substantive grounds, while allowing plaintiff to use undisclosed audio recordings of a witness interview because they "had no substantive value: the impeaching statement concerned the clarity of the witness's memory, not the specific events surrounding the accident."[182]

This Court reaffirmed in *Olivarez* that undisclosed evidence that's even partially substantive cannot be admitted under the impeachment exception.[183] There, recordings of phone calls contradicted the plaintiff's testimony but also provided substantive support to the defendants' defenses.[184] This Court followed *Chiasson* to hold that because the

---

[180] *Id.* at 518.

[181] *Sartin v. Wal-Mart Stores, Inc.*, 207 F.3d 658; 2000 WL 122452 (5th Cir. 2000) (unpublished).

[182] *Id.* at * 2.

[183] *Olivarez v. GEO Group, Inc* , 844 F.3d 200 (5th Cir. 2016).

[184] *Id.* at 205.

recordings were in part substantive, they had to be disclosed before trial, regardless of any impeachment value.[185] As the Court explained, when evidence serves both substantive and impeachment functions, it cannot be treated as "solely" impeachment evidence and therefore must be disclosed.[186]

Importantly, in reaching this outcome, this Court examined the evidence's objective character, not merely the defense attorneys' stated purpose for the evidence.[187] So any argument that the attorneys *intended* to use the evidence for impeachment only didn't matter. And in reviewing the evidence's objective character, this Court concluded that, because the evidence could prove a substantive fact in the case, it fell outside the impeachment-only exception to Rule 26's disclosure requirements.[188]

These holdings apply equally here. After all, the testimony of Day, Pearson, and Gannaway might arguably have been used to discredit the Agency Managers' testimony. But it also went to the heart of the question

[185] *Id.* at 205.
[186] *Id.* at 204.
[187] *Id.*
[188] *Id.*

asked of the jurors: how many hours the Agency Managers worked. Under *Chiasson* and *Olivarez*, then, the trial court erred in letting Farm Bureau rely on Rule 26's impeachment exception to circumvent its disclosure requirements.

To be sure, *Chiasson* and *Olivarez* addressed the disclosure of *documents and tangible things* under Rule 26(a)(1)(A)(ii), not *witnesses* under Rule 26(a)(1)(A)(i). But the language of the exception is identical—"unless the use would be solely for impeachment"—in both the witness-disclosure provision and the document-disclosure provision of Rule 26(a)(1)(A). This parallel structure provides a strong basis for arguing the *Olivarez* framework should apply equally to witness disclosures. The Federal Rules of Civil Procedure are interpreted like statutes.[189] Under principles of statutory construction, identical phrases within the same rule should be given the same meaning.[190]

---

[189] *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 376, (2013) (interpreting Rule 54(d)(1) and 15 U.S.C. § 1692k(a)(3)).

[190] *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232, (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Also the rationale underlying *Chiasson* and *Olivarez* applies equally to witnesses. The purpose of mandatory initial disclosures is to accelerate the exchange of basic information and reduce discovery disputes.[191] Allowing parties to withhold witnesses whose testimony bears on substantive issues—simply because that testimony might also impeach another witness—frustrates this purpose and invites gamesmanship.

**2. Admitting this evidence was harmful and requires reversal.**

Where a trial court abuses its discretion by admitting evidence in error, affecting the substantial rights of the complaining party, the case should be remanded for a new trial.[192] For example, in *Chiasson* the Court noted that the surveillance tape "showed Mrs. Chiasson's activities on four separate dates: sweeping the carport, working under a car, entering a store, and buying food."[193] The Court, evaluating whether it was impeachment evidence, described how it was shot at a distance without sound, and had very little impeachment value:

[191] Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment.

[192] *Jauch v. Corley*, 830 F.2d 47, 52 (5th Cir. 1987).

[193] 388 F.2d at 514–15.

> [h]aving reviewed the videotape, as well as Chiasson's testimony, we are not convinced that the former makes the latter less believable. Chiasson testified only that she is unable to carry on daily activities without pain, not that she is entirely unable to do so. The tape shows her carrying on daily activities. It was taken at some distance and has no sound component. It requires quite a leap to conclude that because she engages in routine activities, *ergo,* she does so without pain. In short, we question whether the proffered videotape discredits her testimony at all. Assuming, however, that the tape is of some impeachment value, it is also of a substantive nature.[194]

The Court held its admission harmful error, i.e., affecting plaintiffs' substantial rights, because "its importance is obvious."[195] The same can be said of the only factual testimony offered by Farm Bureau to establish actual working times for any of the Agency Managers.

In contrast, evidence that was erroneously admitted in *Martinez* was harmless because it concerned damages and the jury didn't reach the damages questions.[196] Here, the evidence that was wrongly admitted concerned the first question asked of the jury and the question on which the Agency Managers lost.

---

[194] *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993).

[195] *Id.* at 518.

[196] *Martinez v. State Farm Mut. Auto. Ins. Co.*, 149 F.3d 1177, 1998 WL 414020 at *1 (5th Cir. 1998) (unpublished).

In another example, in *Swearingen,* this Court found that the trial court abused its discretion when it let a deposition of the main witness be read at trial in lieu of live testimony.[197] This Court found that decision affected the plaintiff's substantial rights, warranting a new trial, because the improperly admitted deposition transcript constituted key witness testimony.[198]

And in *Carlson*, this Court held that the trial court erred in admitting expert testimony.[199] This Court held that the error warranted a new trial because the expert was the only witness presented by the party, the party relied on his expert testimony during its closing argument, and the jury returned a verdict for the party on the issue for which the expert testified.[200]

Similarly, the testimony of these witnesses was key to Farm Bureau's case at trial. Farm Bureau only offered testimony from witnesses with personal knowledge against five agency managers (Cook,

---

[197] *Swearingen v. Gillar Home Health Care, LP,* No 17-20600, 2019 WL 177959, at **2–3 (5th Cir. 2019).

[198] *Id.* at *3.

[199] *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199, 201 (5th Cir. 2016).

[200] *Id.* at 202.

Ferguson, Martin, McCord, and Stanton). For three of these, excluded witnesses played critical roles in the proof offered by Farm Bureau.

For example, to prove Matt Stanton's hours, Farm Bureau called Vicki Abell and Joan Day. But Abell was only able to testify about Stanton's work after April 2016.[201] Without Day's testimony Farm Bureau would have had no evidence of Stanton's work up to then. Abell and Day also worked in different offices.[202] Without Day, Farm Bureau would've had no evidence of Stanton's work in the Dickens office at any time. Likewise, for Ricky Martin's hours, Farm Bureau called Shannon Gannaway and John Brown. Brown left Ricky's office in July 2016, leaving only Gannaway to testify about his hours after that date.[203] For McCord, Nancy Sparks didn't work in the Jones office and did not know hours he worked there.[204] Instead, Farm Bureau relied on Mary Pearson to describe McCord's hours in the Jones office.[205]

---

[201] ROA.26384–26385.

[202] ROA.26367 (20–22), ROA.26384–26385.

[203] ROA.26607–26608.

[204] ROA.26517–26518.

[205] ROA.2652–26532.

In letting Farm Bureau call undisclosed witnesses to testify about the Agency Managers' hours through the impeachment exception, it allowed key witness testimony on the primary issue in the case—testimony that was neither cumulative nor duplicative. And the jury returned a verdict for Farm Bureau on the issue these witnesses testified on. Under *Chiasson*, *Swearingon*, and *Carlson* this error was harmful and affected Plaintiffs' substantial rights. This alone entitles the Agency Managers to a new trial.

## II. The court erred in admitting evidence of the Agency Managers' high earnings because their earnings are irrelevant and highly prejudicial.

So does the trial court's error in admitting irrelevant and prejudicial evidence about the Agency Managers' substantial pay. That the Agency Managers were well paid has no bearing on whether they worked over 40 hours a week, whether Farm Bureau knew of their work, or whether Farm Bureau misclassified them willfully. Because their earnings have no bearing on these issues, their earnings are irrelevant. And because their earnings were high—"most often the highest income

earners in their towns"[206]—the evidence was highly prejudicial as it suggested they don't need or deserve overtime. The prejudicial effect of this evidence explains why the jury returned a verdict that *none* of the Agency Managers worked overtime, even when many testified without contradiction that they'd done so.

### 1. Earnings evidence is irrelevant.

To be relevant the evidence must have some "tendency to make a fact more or less probable than it would be without the evidence" and where "the fact is of consequence in determining the action."[207] For a fact to be "of consequence to the determination" means "it must be shown that the evidence to be offered has a legal connection to the action."[208]

"Whether a proposition is of consequence to the determination of the action is a question that is governed by the substantive law. Simply stated, the proposition to be proved must be part of the hypothesis governing the case a matter that is in issue, or probative of a matter that

[206] ROA.26790 (303:3–4).

[207] Fed. R. Evid. 401; *see also* Fed. R. Evid. 402.

[208] *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 629 F.2d 993, 999–1000 (5th Cir. 1980).

is in issue, in the litigation."[209] For example, in *Williams* this Court observed that evidence proving the existence of a confidentiality policy "would be of consequence to the action only if reliance on the policy would constitute a defense."[210]

Here, the only issues before the jury were: (1) whether the Agency Managers worked over 40 hours any week, and, if so, how many; (2) whether Farm Bureau knew or should've known of work over 40 hours in a week; and (3) whether Farm Bureau's misclassification was willful.[211]

How much the Agency Managers earned is neither part of nor probative of any of these issues. This distinguishes this case from those where the amount of wages are an element of a claim or defense. For example, in *Karna* where the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work

---

[209] *United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. 1981).

[210] *Williams*, 629 F.2d at 999–1000.

[211] *See e.g.*, ROA.23322–23326 (Final Verdict Form).

performed by the employee was a factor the district court instructed the jury to consider.[212]

That this is a case seeking overtime pay does by itself make earnings relevant. "The determination of relevancy is not automatic or mechanical."[213] For example, in *Wilkins*, the Northen District of Illinois found that pay level of salespeople was irrelevant in an FLSA case.[214]

"[R]elevancy describes the logical relationship between a proffered item of evidence and a proposition that is material or provable in a given case."[215] "[E]vidence is relevant when it is persuasive or indicative that a fact in controversy did or did not exist because the conclusion in question may be logically inferred from that evidence."[216] "Implicit" in the definition of relevant evidence are requirements that "the evidence be probative of proposition it is offered to prove[.]"[217]

---

[212] *Karna v. BP Corp. N. Am,* 609 Fed. Appx. 814, 819 (5th Cir. 2015) (unpublished).

[213] *United States v. Allison*, 474 F.2d 286, 289 (5th Cir. 1973), *opinion vacated on reh'g on other grounds*, 490 F.2d 79 (5th Cir. 1974).

[214] *Wilkins v. Just Energy Group, Inc.*, No. 13 C 5806, 2019 WL 13251179, at *3 (N.D. Ill. Aug. 4, 2019).

[215] *Allison*, 474 F.2d at 289.

[216] *Id.* at 289.

[217] *Hall*, 653 F.2d 1005.

Taken together, Farm Bureau's evidence about how much the Agency Managers earned is relevant only if (1) the amount earned supported that they worked less than 40 hours a week (or shed light on the number of hours they may have worked), (2) it showed that Farm Bureau had no reason to think they worked over 40 hours a week, or (3) it showed that Farm Bureau's misclassification was not willful.

Everyday experience teaches the ordinary logical relationship between pay and hours worked is that higher pay is associated with longer hours. Indeed, hourly paid workers are the prototypical example. Likewise, logic suggests that commissioned workers earn more when they work longer, as more time on the job implies more opportunities to procure sales.

Farm Bureau offered no evidence to reverse this ordinary understanding. Rather, Farm Bureau's evidence and arguments negated *any* relationship between hours and earnings. In fact, Southern Farm Bureau came right out in opening statement and made it clear that the Agency Managers' pay is not based on time or hours worked, and they

"can do virtually no work and still get paid an enormous amount of money[.]"[218]And Farm Bureau elicited proof that commissions can be earned by "what they're not doing when they're not doing it, when they may not even know about it."[219]

If earnings and hours were correlated, Farm Bureau would have emphasized the Agency Managers' low earnings to argue they worked less than 40 hours. Instead, Farm Bureau relies on low production.[220] Although it admits there is no direct correlation between performance and hours worked,[221] Farm Bureau attacks Beakley, Ferguson, and Henry's hours estimates on the grounds they have low production.[222] And

[218] ROA.24800–01.

[219] ROA.26790.

[220] ROA.26855.

[221] ROA.26713, ROA.26735.

[222] ROA.26315.

it attacks the estimates of Blackwell,[223] Peek,[224] Wheeler,[225] Lovelady,[226] and Cook[227] on the grounds of low performance.

These attacks highlight the absence of any connection between earnings and production or performance because Farm Bureau also offered evidence of high earnings against these same people. Farm Bureau offered evidence that Beakley "like[d] the amount that [he was] getting paid"[228] that Ferguson's commissions could be "hundreds of thousands of dollars"[229] and that Henry made "a pretty significant amount of money[.]"[230] Farm Bureau offered evidence that Blackwell made "good money,"[231] Wheeler was making "a ton of money";[232] Peek was "paid a significant amount of money," was "very well compensated,"

223 ROA.26710.
224 ROA.26722.
225 ROA.26726
226 ROA.26727.
227 ROA.26739.
228 ROA.25317.
229 ROA.25722–23
230 ROA.25805.
231 ROA.25487.
232 ROA.25101.

and making "more than six…six figures[,]";[233] Lovelady was "highly paid";[234] and Cook made "good money."[235]

Altogether, there's simply nothing logically relating earnings to the number of hours the Agency Managers worked. Without that, their earnings can't be relevant to show how many hours they worked.

It follows that if earnings and hours aren't correlated, then earnings could have no bearing on whether Farm Bureau knew or should've known about the number of hours Agency Managers worked. Especially when Farm Bureau is clear it didn't care if managers worked over 40 hours as it was "just not something that's a metric for us. Not something we track."[236]

Finally, evidence the Agency Managers were highly paid is irrelevant to willfulness because there's no evidence or suggestion it played any role in deciding to classify Agency Managers as employees.

[233] ROA.25857.

[234] ROA.25382.

[235] ROA.25212–13.

[236] ROA.26832.

Willfulness turns on whether the employer knew or showed reckless disregard as to whether its conduct violated the FLSA.[237]

Farm Bureau admits it classified the Agency Manager position as an independent contractor so long ago no one remembers it.[238] In fact, there are no documents about the decision still existing.[239] Moreover, Farm Bureau has never revisited that decision.[240] Not even after the trial court ruled that Agency Managers are employees as a matter of law.[241]

It would be pure speculation to assume that the Agency Managers' earnings factored into a decision made 70 years ago. And because it has never reevaluated that decision, Farm Bureau cannot say it is now relying on their pay as grounds for its classification decision because in truth it is simply relying on the decision made in the 1950s. Finally, Farm Bureau offers no evidence linking its 1950s decision to classify Agency Managers as contractors to their earnings or showing that it

---

[237] *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir. 1990).

[238] ROA.26884.

[239] ROA.26885–86.

[240] ROA.26885.

[241] ROA.26891.

reevaluated the classification decision and in part relies on the Agency Mangers' income as part of its basis for the decision.

Despite being irrelevant, Farm Bureau repeatedly injected the amount of earnings, including post-termination earnings, as well as descriptions of them making a lot of money throughout the case. This chart shows just the times it was brought up with the Agency Managers:

| **Plaintiff** | **Testimony and Questions** | **Exhibits** |
|---|---|---|
| Martin | ROA.24926; ROA.24929–30;ROA.24981; ROA.24982 | ROA.22807 |
| Wheeler | ROA.25101–04; ROA.25109–11; ROA.25114–16 | ROA.22816 |
| Cook | ROA.25178; ROA.25212–13; ROA.25230 | ROA.22854–85; ROA.22927 |
| Beakley | ROA.25313; ROA.25317 | ROA.22960 |
| Lovelady | ROA.25357–58; ROA.25832–83 | ROA.22994 |
| McCord | ROA.25417–19; ROA.25447 | ROA.23034 |
| Blackwell | ROA.25487–89; ROA.25503–04; ROA.25508 | |

| | | |
|---|---|---|
| Stanton | ROA.25625 | |
| Ferguson | ROA.25722–23;ROA.25749; ROA.25781–82 | ROA.23193 |
| Henry | ROA.25805; ROA.25812–13 | ROA.23212 |
| Peek | ROA.25857–58; ROA.25859; ROA.25865 | ROA.23231 |

And Farm Bureau followed up with testimony from its witnesses, with one injecting into an answer not about compensation that "The average agency manager earns *350, $450,000 a year*."[242] Later, a Farm Bureau witness touted that "[o]ur agency managers are most often *the highest income earners in their towns* with the most flexibility. It's the best deal — it's the best deal going."[243]

Because earnings evidence was irrelevant to any issue, the trial court erred in admitting it.

**2. The earnings evidence was unfairly prejudicial.**

---

[242] ROA.26225 (emphasis added).

[243] ROA.26790 (emphasis added).

Besides being irrelevant, the evidence should've been excluded under Rule 403, which provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury[.]"[244]

Even if the evidence of earnings had minimal probative value, the repeated theme that the Agency Managers earned a lot of money created a substantial danger of unfair prejudice by inviting the jury to decide the case based on wealth bias and moral outrage rather than the law.

As far back as 1940, the Supreme Court warned that "appeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them."[245] An example of the intersection of bias against wealth and a statute arose in *Noviello*.[246] There the trial court correctly determined that a video (of the plaintiff sitting with stacks of money) could "could easily prejudice the jury into

---

[244] Fed. R. Evid. 403.

[245] *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940). This Court cited this warning in a criminal case in 2008. *United States v. Arledge*, 553 F.3d 881, 895 (5th Cir. 2008).

[246] *Noviello v. Holloway Funding Group*. No. 3:22-CV-52-BN, 2023 WL 2195768, at *3 (N.D. Tex. Feb. 23, 2023)

believing Noviello is misusing the statute to become rich" when, "using the TCPA to sue on the kind of conduct that the statute targets, and doing so to pursue statutory damages, is not a misuse of the statute."[247] Likewise, the Agency Managers here were not misusing the FLSA, yet Farm Bureau's drumbeat of how much they were paid, and still being paid, by Farm Bureau likely prejudiced the jury into believing the Agency Managers were misusing the FLSA.

Other district courts in this Circuit have noted prejudice against wealthy litigants, excluding evidence of net worth and income.[248]

The evidence offered painted the Agency Managers as greedy people who, having been well paid by Farm Bureau betrayed it by

---

[247] *Id.*

[248] *Dubea v. Simpson*, No. 9:07-CV-63-TH, 2009 WL 10677421, at *1 (E.D. Tex. Mar. 2, 2009) (bifurcating trial to avoid possible 'Robin Hood' mentality among jury); *Childers v. Rent-A-Ctr. E., Inc.*, No. CV 21-960, 2024 WL 4907624, at *2 (E.D. La. Oct. 2, 2024) (excluding net worth and financial condition of defendant); *Owens v. Shelter Mut. Ins. Co.*, No. 3:23-CV-173-KHJ-MTP, 2024 WL 2625992, at *3 (S.D. Miss. May 24, 2024) (finding relative wealth irrelevant, and any marginal value outweighed by danger of unfair prejudice); *St. Andrews Presbyterian Church Lake Charles v. Church Mut. Ins. Co.*, No. 2:21-CV-02747, 2022 WL 20689744, at *3 (W.D. La. Nov. 4, 2022) (excluding financial condition, including overall profits or income, on 403 grounds); *Ainsworth v. Gildea*, No. 3:09CV68-DPJ-JCS, 2010 WL 4007320, at *2 (S.D. Miss. Oct. 12, 2010) (excluding net worth from liability phase as unfairly prejudicial while allowing aspects of party's wealth directly relevant to claim to be admitted).

reneging on their contracts to sue for even more money. Central to the theme was that they were highly paid by Farm Bureau. This evidence was unfairly prejudicial because it framed legally required overtime pay as unnecessary because of their high earnings and as undeserved given their post-termination payments. Farm Bureau sought jury nullification of the FLSA—effectively asking the jury to find that the FLSA doesn't apply to high-wage earners—which, of course, it does.[249]

This appeal to decide a case based on emotion is one of the reasons Rule 403 exists.[250] Because the evidence of earnings is irrelevant—or perhaps of only the most marginal relevance—the substantial danger of unfair prejudice means it should've been excluded.

### 3. Admitting earnings was harmful and requires reversal.

Here, the trial judge erred by admitting earnings, which substantially prejudiced the Agency Managers' rights. As in *Chiasson*, *Swearingen*, and *Carlson*, the errantly admitted evidence constituted a prominent part of Farm Bureau's case. Farm Bureau raised earnings

[249] *Hewitt*, 598 U.S. at 44 ("Employees therefore are not deprived of the benefits of overtime compensation] simply because they are well paid.") (cleaned up).

[250] *U.S. v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007).

with each Agency Manager, had their witness interject uncalled-for testimony about average income, and offered exhibits showing post-termination payments.

Here, the admission of irrelevant and prejudicial evidence influenced the verdict. The jury's finding against all the Agency Managers on whether they worked overtime—despite there being no evidence contradicting several of the Agency Managers' credible testimony about hours worked, as will be shown next—demonstrates the prejudicial effect the improper evidence had. It is exactly the verdict a jury acting on emotion would return.

## III. Farm Bureau failed to meet its burden to disprove that the Agency Managers worked overtime.

The jury's verdict simply did not reflect the evidence—as Farm Bureau never disproved the Agency Managers' overtime hours. Normally, "an employee who brings suit for unpaid overtime compensation bears the burden of proving, with definite and certain evidence, that he performed work for which he was not properly

compensated."[251] But when an employer fails to keep FLSA-compliant records of wages, hours, and other conditions and practices of employment, the solution "is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work."[252] Rather, under *Mt. Clemens*, an employee is deemed to have met his burden

> if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.[253]

Here it's undisputed Farm Bureau failed to keep any FLSA-compliant time records, so the *Mt. Clemens* burden-shifting framework applies. And under that framework, it's undisputed Farm Bureau didn't pay the Agency Managers any overtime. Thus, the Agency Managers

---

[251] *Reeves v. Int'l Tel. & Tel. Corp.*, 616 F.2d 1342, 1351 (5th Cir.1980), *abrogated on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988).

[252] *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946).

[253] *Id.* at 687–88.

only needed to show they worked over 40 hours by a just and reasonable inference to shift the burden onto Farm Bureau.[254] As this Court stated,

> [u]nder *Mt. Clemens*, if the employer's records are inaccurate or inadequate, a plaintiff need only show by just and reasonable inference that she was an employee, worked the hours, and wasn't paid. It's a lenient standard rooted in the view that an employer shouldn't benefit from its failure to keep required payroll records, thereby making the best evidence of damages unavailable.[255]

At trial, the Agency Managers satisfied their lenient prima facie burden under *Mt. Clemens* with estimates of weekly overtime hours derived from their testimony.[256] They testified that they routinely worked over 40 hours in a week and testified as to their overtime estimates based on their typical work schedules and job duties:

| **Agency Manager** | **Testimony about Overtime** |
|---|---|

[254] *Mt. Clemens*, 328 U.S. at 687.

[255] *United States Dep't of Labor v. Five Star Automatic Fire Prot., L.L.C.*, 987 F.3d 436, 439–40 (5th Cir. 2021); *see also Hobbs v. EVO Inc.*, 7 F.4th 241, 257 (5th Cir. 2021) (accord).

[256] *See, e.g.*, *Hobbs*, 7 F.4th at 257 ("We assess employees' evidence under a lenient standard rooted in the view that an employer shouldn't benefit from its failure to keep required payroll records, thereby making the best evidence of damages unavailable. This leniency has led us to accept estimates of weekly overtime hours derived from plaintiffs' testimony as adequate evidence of damage."); *Flores v. FS Blinds, L.L.C.*, 73 F.4th 356, 363 (5th Cir. 2023) ("Their testimony alone would be sufficient.").

| | |
|---|---|
| Beakley | ROA.25261–25285 |
| Blackwell | ROA.25451–25476 |
| Henry | ROA.25783–25802 |
| Lovelady | ROA.25336–25350 |
| Peek | ROA.25828–25843 |
| Wheeler | ROA.25000–25034 |
| Ferguson | ROA.25657–25710 |
| Stanton | ROA.25511–25549 |
| Martin | ROA.24807–24966 |
| Cook | ROA.25152–25177 |

So here, the Agency Managers met their "lenient" burden under *Mt. Clemens*.[257] Therefore, the burden at trial was on Farm Bureau.

But Farm Bureau failed to carry its burden under *Mt. Clemens* at trial as a matter of law. It didn't come forward with "evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."[258] It was Farm Bureau's burden to put on evidence disproving

[257] *Hobbs*, 7 F.4th at 257.

[258] *Mt. Clemens Pottery Co.*, 328 U.S. at 687–88.

the Agency Managers' testimony.[259] And Farm Bureau failed because its witnesses had no knowledge whatsoever of the hours worked by some Agency Managers, or only limited knowledge of some hours of others.

Moreover, none of Farm Bureau's witnesses had any knowledge of the hours Agency Managers worked outside the office, which is important because Agency Managers were permitted to work unlimited hours, and at any time and place they desired. Much of the Agency Managers' evidence was uncontroverted. And where Farm Bureau tried to controvert it, it failed to offer precise and specific evidence of work hours to rebut the Agency Managers' evidence.[260] As one court put it:

> A modest burden is imposed on employees and then a more stringent rebuttal burden on employers because the remedial nature of the FLSA and the great public policy which the FLSA embodies militate against making' the burden of

[259] *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1330 (5th Cir. 1985)

[260] *See, e.g., Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1298 (3d Cir. 1991) ("[T]he major principle of *Mt. Clemens* [is] that, once the Secretary's prima facie case is made, the burden shifts to the employer to dispute it with precise evidence of hours worked."); *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985), *disapproved of on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) (noting "evidence of precise work performed" was required to negate or rebut prima facie case); *Bledsoe v. Wirtz*, 384 F.2d 767, 771 (10th Cir. 1967) ("T]he duty to keep records rests solely with the employer and failure to comply with this obligation to keep records shifts to the employer the burden of specifically and expressly rebutting the reasonable inferences drawn from the employee's evidence as to the amount of time spent working.").

> proving uncompensated work 'an impossible hurdle for the employee.'[261]

As the following sections discuss, Farm Bureau failed to keep FLSA-compliant records and failed carry its *Mt. Clemens* burden.

1. **Farm Bureau presented no witnesses with personal knowledge of the work schedules of Beakley, Blackwell, Henry, Lovelady, Peek, and Wheeler.**

At trial, there was no testimony from anyone with knowledge of the work schedules of Beakley, Blackwell, Henry, Lovelady, Peek, and Wheeler. Thus, Farm Bureau failed to produce the evidence required under *Mt. Clemens*.

Farm Bureau offered only the speculative opinions of Associate State Sales Directors Justin Ingram and Chris Whitney, V.P. of Sales Sloan Brown, and Agency Manager Cade Taylor. None of these witnesses worked alongside the Agency Managers, and none personally observed any daily work performed by them. For example, when asked specifically about Beakley's estimate, Ingram testified only that he thought it was "extremely unlikely" based on the agency's performance and his

[261] *Acosta v. Cent. Laundry, Inc.*, No. CV 18-190, 2019 WL 3413514, at *11 (E.D. Pa. July 29, 2019) (citation modified).

experience.[262] Similarly, when asked about Henry's estimate he testified only that he had "serious doubts about that type of hours worked."[263] He also found it "hard to believe that any agency manager could say they consistently worked 50 to 60 hours a week."[264] Brown and Whitney offered similar speculative testimony based on their "experience" rather than personal observation of any Agency Managers' daily routine.[265] Taylor (who never worked with Wheeler)[266] testified that his "research" suggested an agency in decline.[267]

This evidence doesn't disprove that these Agency Managers worked some overtime. In fact, Farm Bureau's witnesses admitted that Agency Managers do work overtime.[268] At best, these witnesses' "serious doubts" or disbelief of the estimates bears only on the amount of overtime worked; it doesn't disprove that some overtime was worked by these

---

[262] ROA.26224.

[263] ROA.26220.

[264] ROA.26220.

[265] *See, e.g.*, ROA.26722, 26804.

[266] ROA.26937

[267] ROA.26939

[268] ROA.26694, 26750 (Whitney), 26262 (Ingram), 26606 (John Brown).

Agency Managers.[269] Even a witness's personal experience that they "rarely worked 40 hours a week"[270] as an agency manager doesn't disprove their testimony either because Farm Bureau permitted managers and agents to work as few or as many hours as they desired at any time and place. That one manager chose to work less doesn't disprove any other Agency Manager's estimates or render them unreasonable; and it doesn't disprove that these Agency Managers worked some amount of overtime. "Work not requested but suffered or permitted is work time."[271] In fact, Farm Bureau acknowledged that every agency manager differs in how they perform their job so that one manager's experience is not the same as another's.[272] This is especially true here because Farm Bureau let managers work unlimited hours at any time and place they desired.

---

[269] *See Flores v. FS Blinds, L.L.C.*, 73 F.4th 356, 365 (5th Cir. 2023) ("[W]hile the company has offered evidence that may well bear on the amount of overtime Plaintiffs worked, i.e., the compensation they are owed, FS Blinds has failed to negate Plaintiffs' proof that they in fact worked overtime for which they were not compensated.").

[270] ROA.26220.

[271] 29 C.F.R. § 785.15.

[272] ROA.26231.

Farm Bureau had the burden under *Mt. Clemens*. It failed to carry it with evidence at trial.

**2. Farm Bureau's witnesses did not disprove any of the Agency Managers' overtime estimates.**

Farm Bureau offered the testimony of several agents, ISRs, and managers to counter the Agency Managers' estimates. But these witnesses' testimony is consistent with the Agency Managers' accounts of working some overtime. In fact, the witnesses testified solely about the amount of hours each Agency Manager worked *inside the office*. These witnesses offered no testimony concerning hours outside the office. And they confirmed that managers and agents do perform work outside the office. Thus, Farm Bureau's evidence only set the floor as to the amount of time the Agency Managers worked during each workweek, but there's no competent rebuttal testimony concerning the maximum. Moreover, several Farm Bureau witnesses couldn't testify at all about certain time periods at issue because those witnesses were not working for Farm Bureau at the time or did not work alongside and personally observe the Agency Managers' work. Thus, Farm Bureau's evidence fails to disprove

that the Agency Managers worked some overtime. Giving it the most charitable treatment, it bears only on the amount of overtime worked.

### A. Farm Bureau failed to disprove the overtime estimates of Matt Stanton.

Matt Stanton estimated that he generally worked around 55 hours per week from April 2014 to March 2017, although there were some weeks he may have worked less.[273] He described thoroughly his typical workweek, which required managing two offices in separate rural counties with over 800 insureds; and he described the duties required of an agency manager, both inside and outside the office.[274] He testified that he was typically in the Ralls, Texas/Crosby County office (his main office) between 9:00–9:30 a.m., but he was usually working before that.[275] Stanton also went beyond his *Mt. Clemens* obligation, providing a detailed account of a specific week he worked an estimated 64–65 hours.[276]

[273] ROA.25516.

[274] ROA.25512–25549.

[275] ROA.25516–25519.

[276] ROA.25531–25541.

And Far Bureau could not negate it. The testimony of Farm Bureau's witnesses, Joan Day and Vicki Abell, didn't disprove Stanton's estimate under *Mt. Clemens*. For one thing, Day and Abell had no knowledge of Stanton's work during April and May 2014. Additionally, neither controverted the time he worked outside the office—before, during, or after office hours.

Joan Day, the ISR for the Dickens County office in Spur, Texas only testified concerning June 2014 to March 2017,[277] leaving April and May 2014 entirely unaddressed. Moreover, Day's testimony about Stanton's hours was limited solely to a 15–30-minute period every Thursday she saw Stanton in the office.[278] In fact, she confirmed Stanton's testimony that he came to the Dickens office once a week.[279] Day had no personal knowledge of Stanton's hours at the Ralls/Crosby office or working outside either office.[280]

---

[277] ROA.26367 (20–22).

[278] ROA.26383.

[279] ROA.26382.

[280] ROA.26383.

Vicki Abell provided testimony concerning Stanton's work in the Ralls/Crosby office, but only for 10–11 months beginning in April 2016.[281] So there's a two-year period from June 2014 to May 2016 entirely unaddressed by either Abell or Day, except for the 15–30-minute period every Thursday Joan Day saw Stanton in the Dickens/Spur office. But Abell confirmed Stanton's testimony that he usually arrived at the Ralls/Crosby office around 9:00–9:30 a.m.[282] She also confirmed he'd leave the office as late as 4:30 p.m. and sometimes earlier.[283] Abell provided no testimony as to how much Stanton worked outside the office before he arrived at the Ralls/Crosby office.[284] She confirmed that he would stop by the Cotton Gin office to meet with customers once or twice a week.[285] Abell said she didn't think Stanton worked more than 40 hours during the 10–11 months she observed him.[286] But she didn't know his

[281] ROA.26384–26385.

[282] ROA.26387.

[283] ROA.26387.

[284] ROA.26387 (18–21).

[285] ROA.23387.

[286] ROA.26392.

hours worked outside the Ralls/Crosby office during that time.[287] And she admitted she didn't actually know how many total hours Stanton worked in any workweek beyond the time he spent working inside the Ralls Crosby office during the 10–11 months she was there.[288]

Abell and Day's testimony did not disprove that Stanton worked some amount of overtime. Their testimony only set the floor as to the amount of time he spent working in the office. This evidence is insufficient to carry Farm Bureau's burden under *Mt. Clemens.*

### B. Farm Bureau failed to disprove the overtime estimates of Christopher Ferguson.

The same is true for Christopher Ferguson. From April 2014 to December 2016, Ferguson was a manager in Matagorda County.[289] He estimated that he typically worked 50–55 hours a week, but not every week.[290] He typically got to the office around 7:45 a.m. and left around 5:30–6:00 p.m.[291] He estimated that he tried to be in the office around

[287] ROA.26394 (1–3), 26395-26398, 26400, 26403–26406.

[288] ROA.26404–26404.

[289] ROA.25662 (12–18).

[290] ROA.25671 (2–7).

[291] ROA.25672–25677.

40 hours per week.[292] He performed work outside the office, after office hours, and on weekends.[293]

Farm Bureau offered the testimony of Ashley Girlinghouse, who was an ISR for Christopher Ferguson.[294] She testified that Ferguson usually worked in the office from around 8:30–9:00 a.m. until 3:00–3:30 p.m.[295] Although, he'd be in the office before 8:00 a.m. for board meetings.[296] Girlinghouse estimated he worked between 20–30 hours a week in the office.[297] She offered no opinion as to how many hours Ferguson performed work outside the office.[298] When asked by Farm Bureau if there was "any possibility Mr. Ferguson was working over 40 hours a week on a routine basis" she answered "no."[299] But she admitted she didn't know how many hours Ferguson performed work outside the

[292] ROA.25679 (2–5).

[293] ROA.25677–25681.

[294] ROA.25323.

[295] ROA.26327, 26331.

[296] ROA.26327 (19–21).

[297] ROA.26332.

[298] ROA.26353 (1–6), 26359–26360.

[299] ROA.26365.

office.[300] And she admitted she doesn't actually know how many total hours he worked in any workweek beyond the 20–30 hours he worked inside the office.[301] Thus, her testimony of 20–30 hours per week of work inside the office merely set the floor for Ferguson's hours worked, not the ceiling.[302] Her testimony didn't disprove that Ferguson worked some overtime, though it may bear on the *amount* of overtime. This is insufficient to carry Farm Bureau's burden under *Mt. Clemens*.

### C. Farm Bureau failed to disprove the overtime estimates of Mike Cook.

Farm Bureau also failed to carry its burden as to Mike Cook. Cook was a Farm Bureau agency manager over 30 years.[303] During the timeframe at issue, he managed offices in Dumas, Borger, and Stinnett.[304] He spent more time in the Borger office than Dumas, and visited the Stinnet office sporadically.[305] From 2014 until he retired, he

---

[300] ROA.26353 (1-6), 26359-26360.

[301] ROA 26359–26360.

[302] ROA.26362 (4–7).

[303] ROA.25152 (12–23).

[304] ROA.25157–25158).

[305] ROA.25158 (2–5), 25160 (20–22).

typically got to the office around 8:30–9:00 a.m., but it varied.[306] And he conducted a lot of work from home.[307] He had no typical time at which he left the office.[308] And he conducted substantial work outside the office.[309] He estimated that he worked 45–50 hours per week.[310]

Farm Bureau offered the testimony of Joe Rivera, but he only knew of Cook's hours in the Dumas office.[311] He estimated that Cook was in that office 10–12 hours a week.[312] He had no knowledge about Cook's hours at the Borger office or outside either office.[313] And he admitted he and Cook didn't communicate for two years.[314]

Rivera's testimony didn't disprove Cook's estimate. It didn't disprove any of Cook's testimony about hours at the Borger office, where Cook spent most of his office time. And it didn't disprove any of Cook's

---

[306] ROA.25162.

[307] ROA.25155 (12–20).

[308] ROA.25164 (16–24).

[309] ROA.25155 (12–20), 25163–25166.

[310] ROA.25167 (1–2).

[311] ROA.26919–26920.

[312] ROA.26909.

[313] ROA.26919–26920, 26923 (4–6), 26931 (18–24).

[314] ROA.26910 (10–12).

testimony about the work he did away from either office. Instead, it only established that Cook spent 10–12 hours a week in the Dumas office. Rivera's testimony didn't disprove Cook's estimate or demonstrate Cook didn't work some overtime. So Farm Bureau failed to carry its *Mt. Clemens* burden here too.

### D. Farm Bureau failed to disprove the overtime estimates of Ricky Martin.

It also failed as to Ricky Martin. Martin worked as an agency manager from 2007–2017.[315] He estimated that he typically worked 60–65 hours from April 2014 to January 31, 2017 as the manager for Taylor County.[316] He'd typically get to the office around 7:00–7:30 a.m. and leave around 7:00 or 8:00 p.m.[317] He didn't go into the office every day.[318] His schedule varied, and he would work before he arrived at the office.[319] He performed substantial work outside the office.[320]

[315] ROA.24816.

[316] ROA.24885.

[317] ROA.25005.

[318] ROA.24883 (2–4).

[319] ROA.25005.

[320] ROA.24880–24882, 24884.

Farm Bureau offered the testimony of Shannon Gannaway who worked as an agent in Martin's office beginning May 1, 2015.[321] She had no knowledge of Martin's work for around a year, from April 2014 to April 2015, because she didn't work for Farm Bureau then.[322] As to the remaining time-period, she confirmed Martin typically arrived in the office before her, at least by 7:30 a.m., but possibly earlier.[323] She would see him in the office around four days per week.[324] Gannaway testified Martin typically left in the early afternoon, but she didn't know how he spent his time outside the office.[325]

Farm Bureau also offered the testimony of John Brown who was an agent in Taylor County.[326] He left Taylor County in July 2016.[327] Brown had no knowledge of any work Martin performed from July 2016 through January 2017 because he didn't work for Martin then.[328] For the

[321] ROA.26539.

[322] ROA.26539, 26550 (22–24).

[323] ROA.26553.

[324] ROA.26553.

[325] ROA.26553–26554.

[326] ROA.26560 (13–15).

[327] ROA.26607–26608.

[328] ROA.26514–26515.

remaining time, he didn't dispute Martin's typical arrival time at the office.[329] Brown doubted Martin's estimate and testified he didn't think Martin was in the "in the office each week between 2014 and 2016 over 40 hours."[330] But he admitted he had no evidence that Martin wasn't working over 40 hours inside or outside the office in a workweek.[331] Brown didn't know how much time Martin spent working outside.[332] But he even confirmed agency managers work overtime and Farm Bureau knows this.[333]

At most, this testimony bears on the amount of overtime Martin worked. It doesn't disprove that Martin worked some overtime. So Farm Bureau failed to carry their *Mt. Clemens* burden here too.

* * *

The Agency Managers came to trial with a simple claim: they worked overtime and weren't paid for it. But they never got a fair trial.

---

[329] ROA.26637–26638.

[330] ROA.26591.

[331] ROA.26646.

[332] ROA.26583 (08–10), 26638–26641, 26643 (12–21), 26646 (01–09).

[333] ROA.26621–26622.

The jury heard from witnesses who should've been excluded. It heard repeatedly that the Agency Managers were already paid more than enough—evidence designed not to prove any fact, but to breed resentment. And when the Agency Managers testified about their hours, Farm Bureau offered nothing concrete to rebut them. The verdict reflects these errors. Justice requires a new trial.

## CONCLUSION

For these reasons, this Court should *reverse* the trial court's judgment and *remand* this case for a new trial.

Respectfully submitted,

*/s/ Avi Moshenberg*

Avi Moshenberg
avi.moshenberg@lmbusinesslaw.com
Lawson & Moshenberg PLLC
2301 Commer Street, Suite 200
Houston, TX 77002
Telephone: (832) 280-5670

***Attorneys for Appellant/ Cross–Appellee***

## CERTIFICATE OF SERVICE

I certify that on January 8, 2026, a copy of the foregoing was filed electronically with the Clerk of the Court using the Court's ECF System. Notice of this filing will be sent electronically by operation of the Court's electronic-filing system to all counsel of record who have appeared.

*/s/ Avi Moshenberg*
Avi Moshenberg

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of FED. R. APP. P. 32(A)(7)(B) because:

- it contains 12,917 words, excluding the parts exempted by FED. R. APP. P. 32(f).

2. This brief also complies with the typeface and type-style requirements of FED. R. APP. P. 32(A)(5) and the type requirements of FED. R. APP. P. 32(A)(6) because:

- this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Avi Moshenberg*
Avi Moshenberg