**No. 25-50660**

# In the United States Court of Appeals for the Fifth Circuit

CHRISTOPHER FERGUSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiff – Appellant/Cross-Appellee,*

v.

TEXAS FARM BUREAU; TEXAS FARM BUREAU BUSINESS CORPORATION; TEXAS FARM BUREAU CASUALTY INSURANCE COMPANY; TEXAS FARM BUREAU MUTUAL INSURANCE COMPANY; TEXAS FARM BUREAU UNDERWRITERS; FARM BUREAU COUNTY MUTUAL INSURANCE COMPANY OF TEXAS; SOUTHERN FARM BUREAU LIFE INSURANCE COMPANY,

*Defendants – Appellees/Cross-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, Waco Division
Civil Action No. 6:17-CV-00111

## BRIEF OF APPELLEES/CROSS-APPELLANTS

Barry A. Moscowitz
Cassie J. Dallas
Leslie W. Richardson
THOMPSON, COE, COUSINS & IRONS, L.L.P.
700 North Pearl Street, Suite 2500
Dallas, Texas 75201
(214) 871-8200

Markham R. Leventhal
Scott Abeles
CARLTON FIELDS, P.A.
1625 Eye Street, NW, Suite 800
Washington, DC 20006
(202) 965-8100

***Counsel for Appellees/Cross-Appellants***
(additional counsel in signature block)

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**(1) Plaintiff–Appellant/Cross-Appellee:**

Christopher Ferguson

**(2) Opt-In Plaintiffs**

Darrell Beakley
Daryl Blackwell
Gary Clements
Mike Cook
David Henry
Connie Lovelady
Ricky Martin
Lloyd Lynn McCord
Brandon Peek
Matthew Stanton
Brandon Wheeler

**(3) Defendants–Appellees/Cross-Appellants:**

Texas Farm Bureau
Texas Farm Bureau Business Corporation
Texas Farm Bureau Casualty Insurance Company
Texas Farm Bureau Mutual Insurance Company
Texas Farm Bureau Underwriters
Farm Bureau County Mutual Insurance Company of Texas
Southern Farm Bureau Life Insurance Company

**(4) Defendant–Appellee/Cross Appellant Southern Farm Bureau Life Insurance Company is owned equally by the following ten investment corporations or holding companies of the Farm Bureau Federations in ten states, each of which owns a 10% share:**

Arkansas Farm Bureau Investment Corporation
Florida Farm Bureau Holding Corporation
Georgia Farm Bureau Holding Corporation
Kentucky Farm Bureau Investment Corporation
Louisiana Farm Bureau Investment Corporation
Mississippi Farm Bureau Investment Corporation
North Carolina Farm Bureau Investment Corporation
South Carolina Farm Bureau Investment Corporation
Texas Farm Bureau Investment Corporation
Virginia Farm Bureau Holding Corporation

**(5) Counsel for Plaintiff–Appellant/Cross-Appellee Christopher Ferguson:**

Avi Moshenberg
Nicholas R. Lawson
Lawson & Moshenberg PLLC

Kelly E. Cook
Warren A. Berlanga
Wyly & Cook, PLLC

Sean McCarthy
Brian A. Abramson
Williams Hart Boundas, LLP

**(6) Counsel for Defendants–Appellees/Cross-Appellants Texas Farm Bureau Defendants:**

Barry A. Moscowitz
Leslie W. Richardson
Cassie J. Dallas
Thompson, Coe, Cousins & Irons, L.L.P.

**(7) Counsel for Defendant–Appellee/Cross-Appellant Southern Farm Life Bureau Life Insurance Company**

Markham R. Leventhal
Scott Abeles
Cathleen Bell Bremmer
Aaron S. Weiss
Irma Reboso Solares
Stephanie A. Fichera
Carlton Fields, P.A.

/s/ *Barry A. Moscowitz*
Attorney of record for
Appellees/Cross-Appellants
Texas Farm Bureau Defendants

/s/ *Markham R. Leventhal*
Attorney of record for
Appellee/Cross-Appellant
Southern Farm Bureau Life Insurance Company

## STATEMENT REGARDING ORAL ARGUMENT

This appeal involves a jury verdict that found each of eleven plaintiffs failed to meet their burden of proof to show that they were entitled to "overtime" compensation under the Fair Labor Standards Act ("FLSA"). Specifically, the jury answered "No" to the question of whether each plaintiff had proved "that he or she worked more than 40 hours in any workweek while under contract with Defendants." ROA.23322-23. This appeal raises no legitimate basis for overturning the jury's verdict and no difficult issues requiring oral argument. If this Court finds it necessary to address the appellees' conditional cross-appeal, showing why summary judgment should have been granted to defendants without the need for a jury trial, or if the Court determines that oral argument would otherwise be helpful, the appellees would be glad to participate.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ..... i

STATEMENT REGARDING ORAL ARGUMENT ..... iv

TABLE OF CONTENTS ..... v

TABLE OF AUTHORITIES ..... ix

JURISDICTIONAL STATEMENT ..... xvi

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..... 1

A. Plaintiffs' Appeal ..... 1

B. The Companies' Conditional Cross-Appeal ..... 2

INTRODUCTION ..... 3

STATEMENT OF THE CASE ..... 4

SUMMARY OF ARGUMENT ..... 16

ARGUMENT ..... 18

I. PLAINTIFFS HAVE WAIVED ANY ARGUMENT FOR JUDGMENT AS A MATTER OF LAW, SO THIS COURT SHOULD AFFIRM THE COURT'S DENIAL OF PLAINTIFFS' RULE 50 MOTION ..... 18

II. THE COURT SHOULD AFFIRM THE DISTRICT COURT'S DENIAL OF PLAINTIFFS' MOTION FOR A NEW TRIAL ..... 19

A. Plaintiffs' Argument For A New Trial Based On Insufficient Evidence Is Meritless and Should Be Denied ..... 19

1. Plaintiffs' "Burden-Shifting" Argument Was Waived ..... 19

**TABLE OF CONTENTS**
(continued)

*Page*


2. Plaintiffs Bore The Burden To Prove Hours Worked .............20

3. More Than Sufficient Evidence Supported The Jury's Verdict .............23

B. The Admission Of Impeachment Testimony Was Proper And Does Not Justify A New Trial .............27

1. The Witnesses Offered Impeachment Evidence .............29

2. The Witnesses' Testimony Did Not Affect Plaintiffs' Substantial Rights .............31

3. The Plaintiffs' Authorities Are Inapposite .............33

C. Generalized Income Evidence Was Properly Admitted .............34

1. Generalized Evidence Of The Plaintiffs' Income Was Relevant .............34

a. Hours Worked .............35

b. The Knowledge Requirement .............36

c. Willfulness .............37

d. Credibility .............38

2. Plaintiffs Failed To Establish Prejudice .............39

3. The Admitted Testimony Does Not Require Reversal .............42

THE COMPANIES' CONDITIONAL CROSS-APPEAL .............43

III. THE COURT SHOULD REVERSE THE DISTRICT COURT'S DISPOSITIONS ON THE "COMMISSION" EXEMPTION .............43

**TABLE OF CONTENTS**
(continued)

Page

A. Section 207(i) Applies To Any "Employer"; It Does Not Exclude The Insurance Industry From Its Scope ....43

B. DOL's 2020 Rule Makes Clear That The Commission Exemption Is Available To All Industries ....45

C. Appellants' Insurance Agencies, And Their Compensation, Satisfied All Requirements Of Section 207(i) ....46

D. The District Court Erred In Analyzing Section 207(i)....49

1. The District Court Incorrectly Found *Mitchell* "Controlling"....49

2. The District Court's Reliance On 29 C.F.R. §779.414 To Exclude The Insurance Industry From Section 207(I) Was Error ....51

3. The District Court's Reliance On 29 C.F.R. §779.316 To Exclude The Insurance Industry From Section 207(I) Was Error ....52

IV. THE COURT SHOULD REVERSE THE DENIAL OF SUMMARY JUDGMENT TO THE COMPANIES BASED ON THE ADMINISTRATIVE, HIGHLY-COMPENSATED, AND EXECUTIVE EXEMPTIONS ....53

A. All Plaintiffs Performed Administrative And Executive Duties....54

B. 11 Of The 12 Plaintiffs Satisfied The Highly Compensated Exemption's Duties And Total Compensation Requirements....54

C. Plaintiffs' Compensation Satisfied The Salary-Basis Test....55

D. The District Court Erred In Holding That The Plaintiffs Did Not Satisfy The Salary-Basis Test ....58

# TABLE OF CONTENTS
(continued)

*Page*


E. Alternatively, The Salary-Basis Test Is Invalid And Cannot Be Enforced ....... 59

V. THE COURT SHOULD VACATE THE DECISION GRANTING SUMMARY JUDGMENT ON "EMPLOYEE STATUS" ....... 61

A. The District Court's Analysis Wrongly Tracked *Hopkins* ....... 62

B. The Companies Raised An Issue Of Material Fact On Every Economic Reality Factor ....... 63

1. Control ....... 63

2. Opportunity For Profit Or Loss ....... 66

3. Releative Investment Factor ....... 67

4. Skills And Initiatives ....... 67

5. Permanency And Integrality ....... 68

CONCLUSION ....... 69

CERTIFICATE OF SERVICE ....... 70

CERTIFICATE OF COMPLIANCE ....... 71

# TABLE OF AUTHORITIES

Page

**Cases**

*Adkins v. Silverman*,
899 F.3d 395 (5th Cir. 2018) .......... 50

*Akins v. Worley Catastrophe Response, LLC*,
2013 WL 1907486 (E.D. La. May 8, 2013) .......... 56

*Alvarado v. Corporate Cleaning Services, Inc.*,
782 F.3d 365 (7th Cir. 2015) .......... 50, 53

*Anderson v. Mt. Clemens Pottery Co*.,
328 U.S. 680 (1946) .......... 1, 16, 21

*Burden v. SelectQuote Insurance Services*,
848 F. Supp. 2d 1075 (N.D. Cal. 2012) .......... 51

*Carlson v. Bioremedi Therapeutic System, Inc.*,
822 F.3d 194 (5th Cir. 2016) .......... 33

*Carrell v. Sunland Construction, Inc.*,
998 F.2d 330 (5th Cir. 1993) .......... 63

*Caskey v. Man Roland, Inc.*,
1996 WL 197370 (5th Cir. 1996) .......... 28

*Chiasson v. Zapata Gulf Marine Corp.*,
988 F.2d 513 (5th Cir. 1993) .......... 30, 33

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) .......... 44, 60

*Connecticut National Bank v. Germain*,
503 U.S. 249 (1992) .......... 45

*Cowart v. Erwin*,
837 F.3d 444 (5th Cir. 2016) .......... 24, 27

**TABLE OF AUTHORITIES**
(continued)

*Page*

*Cruz v. Cervantez*,
96 F.4th 806 (5th Cir. 2024) .....40

*Daskam v. Allstate Corp.*,
2012 WL 4420069 (W.D. Wash. Sept. 24, 2012) .....67

*Eberline v. Media Net, LLC*,
636 F. App'x 225 (5th Cir. 2016) .....64

*Echeverry v. Jazz Casino Co.*,
988 F.3d 221 (5th Cir. 2021) .....28

*Encino Motorcars, LLC v. Navarro*,
584 U.S. 79 (2018) .....51

*Estate of Miranda v. Navistar, Inc.*,
23 F.4th 500 (5th Cir. 2022) .....61

*Hart v. RCI Hospitality Holdings, Inc.*,
90 F. Supp. 3d 250 (S.D.N.Y. 2015) .....38

*HCI Chemicals (USA), Inc. v. Henkel KGaA*,
966 F.2d 1018 (5th Cir. 1992) .....31

*Helix Energy Solutions Group v. Hewitt*,
598 U.S. 39 (2023) .....41, 55, 59, 60

*Hickey v. Arkla Industries, Inc.*,
699 F.2d 748 (5th Cir. 1983) .....64

*Hogan v. Allstate Insurance Co.*,
361 F.3d 621 (11th Cir. 2004) .....51

*Hopkins v. Cornerstone America*,
545 F.3d 338 (5th Cir. 2008) .....61, 62

**TABLE OF AUTHORITIES**
(continued)

Page

*Ihegword v. Harris County Hospital District*,
555 F. App'x 372 (5th Cir. 2014)....................22

*Iontchev* v. *AAA Cab Service, Inc.*,
685 F. App'x 548 (9th Cir. 2017)....................68

*Jauch v. Corley*,
830 F.2d 47 (5th Cir. 1987)....................33

*Karna v. BP Corporation North America, Inc.*,
609 F. App'x 814 (5th Cir. 2015)....................41

*Kohl v. Woodlands Fire Department, Inc.*,
2007 WL 9735822 (S.D. Tex. Apr. 16, 2007)....................22

*Kuebel v. Black & Decker Inc.*,
643 F.3d 352 (2d Cir. 2011)....................21

*Lane v. R.A. Sims, Jr., Inc.*,
241 F.3d 439 (5th Cir. 2001)....................26

*Mallard v. United States District Court for Southern Disttrict of Iowa*,
490 U.S. 296 (1989)....................44

*Marshall v. Hope Garcia Lancarte*,
632 F.2d 1196 (5th Cir. 1980)....................20, 21

*McLaughlin v. Richland Shoe Co.*,
486 U.S. 128 (1988)....................37

*Merritt v. Texas Farm Bureau*,
2026 WL 321605 (5th Cir. Feb. 6, 2026)....................19, 36

*Merritt v. Texas Farm Bureau*,
673 F. Supp. 3d 859 (W.D. Tex. 2023)....................43, 46, 49, 51, 52

**TABLE OF AUTHORITIES**
(continued)

Page

*Mitchell v. Kentucky Finance Co.*,
359 U.S. 290 (1959)....49, 50

*Mozingo v. Oil States Energy, Inc.*,
661 F. App'x 828 (5th Cir. 2016)....37

*Munn v. Algee*,
924 F.2d 568 (5th Cir. 1991)....28

*Noviello v. Holloway Funding Group*,
2023 WL 2195768 (N.D. Tex. Feb. 23, 2023)....41

*Olivarez v. GEO Group, Inc.*,
844 F.3d 200 (5th Cir. 2016)....33

*Parks v. Eastwood Insurance Services, Inc.*,
2003 WL 25682287 (C.D. Cal. Feb. 24, 2003)....51

*Parrish v. Premier Directional Drilling, L.P.*,
917 F.3d 369 (5th Cir. 2019)....61, 63, 64, 68

*Polanco v. City of Austin, Texas*,
78 F.3d 968 (5th Cir. 1996)....26

*Pryor v. Trane Co.*,
138 F.3d 1024 (5th Cir. 1998)....24

*Robinson v. Jackson State University*,
714 F. App'x 354 (5th Cir. 2017)....22

*Rollins v. Home Depot USA*,
8 F.4th 393 (5th Cir. 2021)....19

*Rosales v. Lore*,
149 F. App'x 245 (5th Cir. 2005)....22

# **TABLE OF AUTHORITIES**
(continued)

*Page*

*Sanchez Oil & Gas Corp. v. Crescent Drilling & Production, Inc.*,
7 F.4th 301 (5th Cir. 2021) .......... 62

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) .......... 52

*Swearingen v. Gillar Home Health Care, L.P.*,
759 F. App'x 322 (5th Cir. 2019) .......... 33

*Talbert v. American Risk Insurance Co.*,
2010 WL 1960124 (S.D. Tex. May 14, 2010), *aff'd*, 405 F. App'x 848 (5th Cir. 2010) .......... 68

*Taylor v. HD & Associates, L.L.C.*,
45 F.4th 833 (5th Cir. 2022) .......... 43

*Texas A&M Research Foundation v. Magna Transportation, Inc.*,
338 F.3d 394 (5th Cir. 2003) .......... 27

*Thibault v. Bellsouth Telecommunications, Inc.*,
612 F.3d 843 (5th Cir. 2010) .......... 61, 67

*Thompson v. RCA Corp.*,
1981 WL 2347 (D.D.C. Oct. 22, 1981) .......... 22

*Threlkeld v. Total Petroleum, Inc.*,
211 F.3d 887 (5th Cir. 2000) .......... 23

*United States Postal Service Board of Governors v. Aikens*,
460 U.S. 711 (1983) .......... 23

*United States v. Brock*,
833 F.2d 519 (5th Cir. 1987) .......... 27

*United States v. Fields*,
483 F.3d 313 (5th Cir. 2007) .......... 34

**TABLE OF AUTHORITIES**
(continued)

*Page*

*United States v. Perez*,
223 F. App'x 336 (5th Cir. 2007)....................................................................40

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)...................................................................................40, 41

*Wales v. Jack M. Berry, Inc.*,
192 F. Supp. 2d 1269 (M.D. Fla. 1999) ..........................................................21

*Wilkins v. Just Energy Group, Inc.*,
2019 WL 13251179 (N.D. Ill. Aug. 4, 2019)...................................................41

*Williams v. Manitowoc Cranes, L.L.C.*,
898 F.3d 607 (5th Cir. 2018) ......................................................................19, 27

*Yoder v. Florida Farm Bureau Casualty Insurance Co.*,
2022 WL 1055184 (N.D. Fla. Mar. 9, 2022), *aff'd*, 2023 WL
3151107 (11th Cir. 2023) ................................................................62, 63, 64, 68

*Young v. Board of Supervisors of Humphreys County, Mississippi*,
927 F.3d 898 (5th Cir. 2019) ............................................................................26

*Zamora v. City of Houston*,
798 F.3d 326 (5th Cir. 2015) ............................................................................22

*Zannikos v. Oil Inspections, Inc.*,
605 F. App'x 349 (5th Cir. 2015)......................................................................38

**Statutes**

28 U.S.C.
§1291 ..........................................................................................................xvi
§1331 ..........................................................................................................xvi

**TABLE OF AUTHORITIES**
(continued)

*Page*

29 U.S.C.
§203 ....................44
§207 ....................5, 43, 44, 45
§213 ....................53, 59

**Other Authorities**

29 C.F.R.
§541.200 ....................54
§541.600 ....................54, 56
§541.601 ....................54, 55, 56
§541.602 ....................56
§776.20 ....................44
§779.23 ....................46
§779.303 ....................46
§779.316 ....................52, 53
§779.317 ....................45
§779.318 ....................53
§779.414 ....................51, 52

35 Fed. Reg. 5,856 ....................52

69 Fed. Reg. 22,260 *et seq.* (Apr. 23, 2004) ....................54

85 Fed. Reg. 29,867 ....................43, 45, 46, 52

*The Britannica Dictionary*, https://www.britannica.com/ ....................49

*Merriam-Webster*, https://www.merriam-webster.com/dictionary/ ....................49

Pub. L. 87-30, §6(g) ....................49

## JURISDICTIONAL STATEMENT

The Complaint asserted claims under sections 211(a) and 216(c) of the FLSA, 29 U.S.C. §§211, 216. ROA.123 ¶1. Jurisdiction in the district court was based on a federal question pursuant to 28 U.S.C. §1331. ROA.129 ¶20. On September 10, 2024, the court entered Final Judgment (ROA.23328-29) based on a jury verdict in favor of the Defendant-Companies. ROA.23322. On July 18, 2025, the district court denied Plaintiffs' motions under Rules 50 and 59. ROA.24006-24. Plaintiffs are appealing a final order of the district court. ROA.24025. Jurisdiction in this Court is based on 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

### A. Plaintiffs' Appeal

1. Whether the jury's verdict that each Plaintiff failed to prove he or she worked more than 40 hours in any relevant workweek should be affirmed.

2. Whether Plaintiffs waived their appeal of the district court's denial of their Rule 50 motion where the Plaintiffs did not renew their Rule 50 challenge on appeal and instead ask only for a new trial.

3. Whether Plaintiffs' argument for a new trial under Rule 59 based on "burden-shifting" under *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) should be rejected because Plaintiffs did not seek a new trial under Rule 59 on this ground below.

4. Whether the district court's conclusion that a conflict in substantial evidence justified the jury's verdict should be affirmed.

5. Whether the district court abused its discretion by allowing impeachment testimony to show that Plaintiffs lacked truthfulness and credibility.

6. Whether Plaintiffs' relevance arguments and speculation of prejudice from limited references to their compensation justifies a new trial for all Plaintiffs under this Court's standard of review.

### B. The Companies' Conditional Cross-Appeal

7. Whether the district court erred in denying the Companies' motion for summary judgment based on the "commission" exemption in Section 207(i) of the FLSA on grounds that insurance agencies were not eligible for the commission exemption as a matter of law.

8. Whether the district court erred in holding as a matter of law that application of the Department of Labor's "salary-basis test" disqualified the Plaintiffs from the administrative, executive, and highly compensated exemptions.

9. Whether the district court erred by resolving disputed issues of material fact against the Companies and granting partial summary judgment holding that Plaintiffs were "employees" as a matter of law.

## INTRODUCTION

Plaintiff Christopher Ferguson ("Ferguson") was a former insurance agency manager who operated as an independent contractor for the Texas Farm Bureau insurance companies ("TFB")[1] and Southern Farm Bureau Life Insurance Company ("SFB Life") (collectively, the "Companies"). After his contracts were terminated, he sued claiming to be an "employee" under the FLSA entitled to overtime. Eleven other former agency managers opted in to join this action. (Ferguson and the opt-ins are referred to collectively as "Plaintiffs" or "Agency Managers").

At trial, Plaintiffs each attempted to prove they worked more than 40 hours per week based solely on their own unsupported, self-serving testimony. None proffered *a single witness* from any of their offices to support their claims. Instead, each Plaintiff took the stand and repeated in lock-step the same story, without supporting documents or witnesses, that they worked 50-55 hours or 60-65 hours every week without fail. As trial proceeded, it became clear to the jury that Plaintiffs' claims were not believable. Substantial evidence rebutted each Plaintiff's claim, and the jury made a factual finding that each Plaintiff failed to establish "that

[1] "TFB" includes Texas Farm Bureau Casualty Insurance Company, Texas Farm Bureau Mutual Insurance Company, Texas Farm Bureau Underwriters, and Farm Bureau County Mutual Insurance Company of Texas.

he or she worked more than 40 hours in any workweek while under contract with Defendants." ROA.23322-23.

While the verdict was unremarkable, Plaintiffs offer a set of remarkable arguments seeking to overturn it. They claim the jury was *required* to consider them credible and accept their disputed testimony as true. They attack the "personal knowledge" of multiple defense witnesses who worked alongside Plaintiffs or knew them for decades, despite that this personal knowledge objection was not made below and was not preserved for appeal. They complain that impeachment witnesses should not have been allowed to impeach *them*, and assert that limited references to their income were irrelevant and prejudiced the jury's findings on their hours worked such that a new trial is required.

Plaintiffs do not come close to shouldering the extraordinary burden they bear to overturn a jury verdict. The verdict should be affirmed.

## STATEMENT OF THE CASE

Ferguson commenced this action in April 2017, claiming he was misclassified as an independent contractor and owed overtime. ROA.123-24, 140. Eleven other former agency managers opted in.[2] The district court improperly resolved disputed

[2] The opt-in Plaintiffs are Ricky Martin, Brandon Wheeler, Michael Cook, Darrell Beakley, Connie Lovelady, Lloyd McCord, Daryl Blackwell, Matthew Stanton, David Henry, Brandon Peek, and Gary Clements. Clements failed to appear at trial and the Companies' oral motion for judgment as a matter of law was granted

issues of fact against the Companies and ruled on summary judgment that the Plaintiffs were "employees" and not independent contractors as a matter of law. The court also denied the Companies' motions for summary judgment based on the commission exemption under 29 U.S.C. §207(i), and the administrative, executive, and highly compensated exemptions. ROA.14348-66, 14761-63, 14894, 15004-05, 21760-64, 24224.

Following summary judgment, three issues remained: (1) whether each Plaintiff proved he or she worked overtime during the relevant period; (2) whether the Companies had knowledge, actual or constructive, they worked overtime; and (3) whether the Companies willfully misclassified the Plaintiffs as independent contractors. ROA.23316-18, 23322-26. Plaintiffs bore the burden of proof on each issue.

In support of their case, Plaintiffs presented their own testimony, along with the testimony of two experts:[3] a human-resources professional, and an economist who sought to corroborate the Plaintiffs' claims to overtime. As purported evidence of overtime, each Plaintiff relied solely on memory, providing only generalized testimony as to their "typical" schedules. They proffered no emails or other records

---

against Clements, leaving the claims of 11 Plaintiffs for the jury to decide. ROA.26149; ROA.24243.

[3] ROA.24748, 25041, 25329, 25556, 25880.

reflecting their hours,[4] and called no witnesses with personal knowledge to corroborate their testimony.

Plaintiffs relied solely on their expert for corroboration, Suzanne Stuckwisch, who testified regarding charts she prepared reflecting the timestamps of sent emails. ROA.25970, 25976. Stuckwisch conceded she had not read all of the emails reflected on her charts and did not know how many were personal. ROA.25997-98, 26042-45, 26058. She admitted "sent" emails do not tell the jury anything about how long it took to prepare the email or the time Plaintiffs worked the rest of the day, ROA.26020-23, 26027-30, and that sending an email is not indicative of continuous work. ROA.26063.

Plaintiffs failed to credibly show how many hours they worked in any given workweek. As Cook put it, "You can pick any day you want to [from 2014-2017]. I can't say for sure where I was that day." ROA.25196. Whenever pressed on cross-examination, Plaintiffs conceded that they did not work overtime during the weeks scrutinized. *E.g.*, ROA.24966, 25092, 25192-94, 25422-26.

In addition to exposure on cross, the Companies presented 14 lay and expert witnesses to further negate Plaintiffs' case.[5] The jury heard from industry

[4] ROA.25062, 25210, 25286, 25371, 25420, 25430, 25467, 25568, 25610, 25645-46, 25724, 25803-04, 25843-44.

[5] ROA.26155, 26490, 26821.

professionals that the agency-manager position was not a 40-hour per week type of job.[6] And Agency Managers set their own schedule with no mandated hours. ROA.26603, 26418. Their independent-contractor arrangement allowed them the "opportunity to be involved in a lot of other things," including "second jobs … that limit the time they would be in the office." ROA.26421.

**Beakley** "spent much more time with his side businesses than he did with Farm Bureau." ROA.26222. His production was "significantly below" expectations. ROA.26222. It was "extremely unlikely" he worked overtime. ROA.26224. **Blackwell**'s production declined during the relevant period.[7] His agency was a mess when his successor, John Brown, arrived; it was "poor producing," and its agents "didn't have training at all." ROA.26595, 26599-600. His overtime claim was "a big reach" given his skills and performance. ROA.26710.

**Cook** couldn't say whether, at any given time during the workweek, he was working or antiquing with his wife. ROA.25195-96. He had a "[v]ery inconsistent" routine and was "mostly absent" from the office. ROA.26909. An agent estimated Cook was in the Dumas office "10 to 12 hours a week at the most." ROA.26909. VP of Sales Sloan Brown called Cook's overtime estimate "ludicrous." ROA.26806. Ashley Girlinghouse, a former ISR for **Ferguson**, testified he did not routinely work

---

[6] ROA.26691, 26693, 26765-66.

[7] ROA.25507, 26708-09.

over 40 hours a week,[8] and could not recall *any* week he definitely worked more than 40 hours.[9] Ferguson's production dropped during the relevant period, ROA.26210, when he "turn[ed] off the spigot." ROA.26809. There was "no way" he consistently worked 50-55 hours per week. ROA.26214. As to credibility, Ferguson admitted an entry on his LinkedIn bio was "entirely false." ROA.25764-65.

**Henry** recruited no new agents in his last five years and "rarely" sold policies. ROA.25820-22; ROA.25824. His DSM testified said his claims were "hard to believe." ROA.26220. The jury also learned Henry had been involved in improper insurance rebating. ROA.26217. During the seven-week time period for which **Lovelady** claimed overtime, she was nearing retirement, "packaging her stuff up," not recruiting and training new agents, and not "taking on any more new business." ROA.26810. Despite claiming 50-55 hours per week, she did not do much selling, training, or recruiting during the relevant period; never opened the office; and did not bring her laptop home.[10] Her overtime estimate was "very inconsistent" with her agency's performance. ROA.26727.

---

[8] ROA.26323-24, 26332-34.

[9] ROA.26334, 26362, 26365.

[10] ROA.25353, 25371, 25374-75, 25377.

A witness who knew **Martin** for years testified he has "changed the way [he] view[s] people in a lot of ways" since dealing with Martin, given Martin's insincerity. ROA.26713. An agent, Shannon Gannaway, further impeached his testimony by discussing instances in which she believed he had been untruthful. ROA.26545-47, 26556. She also rebutted Martin's testimony that he routinely spent time training agents, holding meetings, and working through lunch. ROA.26541-43, 26546-47. A former agent under Martin said his claim he worked 65 hours each week was not credible.[11] "There's no way" Martin worked 60-65 hours every week. ROA.26807-08. It was more likely he worked a total of 25-30. ROA.26555.

Agent Nancy Sparks worked with **McCord** and testified that his claim he was working overtime every week was "not true." ROA.26511, 26519. Secretary Mary Pearson denied McCord testimony routinely worked through lunch, worked late nights, and spent time preparing for board meetings. ROA.26526-32. **Peek**'s production declined during the relevant period, when he claimed to be working overtime. ROA.25865-66. His agency was a "revolving door" of agents, reflecting a lack of leadership and engagement. ROA.26721-22. Peek "was a talented agent," and Sloan Brown had "every reason to think with an effort he would have performed well." ROA.26811. His claim was not credible given complaints and low

[11] ROA.26591-92, 26577, 26579-82, 26584-86.

production, ROA.26811, and his hours estimate was "[e]xtremely improbable." ROA.26722.

During the relevant period, **Stanton's** production plummeted, while income from his family-farm rose dramatically, ultimately allowing him to retire from insurance.[12] He sold very few life insurance policies, had few death claims, submitted few applications, and had few policy changes to enter.[13] Secretary Joan Day discredited his testimony.[14] Vickie Abell, who also worked under him, testified he "definitely" did not work overtime.[15] **Wheeler** sold zero life insurance policies in 2015 and one in 2016, and did not recruit new agents. ROA.25135-36. He only sold a dozen new auto policies and earned no new customers in his last three years. ROA.26812-13. His agency's performance declined accordingly. ROA.26725-26. His successor researched the agency before taking it over (ROA.26937), revealing a significant decline in premium and membership under Wheeler's control. ROA.26939. His agency was underperforming and suffered from a lack of training

[12] ROA.25580, 25582, 25588, 25594, 25641.

[13] ROA.25630-35, 25638-39.

[14] ROA.26374-75, 26378-79.

[15] ROA.26384, 26402-03, 26405.

and recruiting new agents.[16] His overtime estimate was "[h]ighly improbable." ROA.26726.

The Companies rested after the eighth day of testimony. ROA.26964. After deliberating for more than three-and-a-half hours,[17] the jury returned a verdict for the Companies, finding no Plaintiff had "prove[d] that he or she worked more than 40 hours in any workweek while under contract with Defendants." ROA.23322-27. The jury did not need to reach the remaining questions on knowledge and willfulness. ROA.23322-27. The Court entered a take-nothing judgment against the Plaintiffs. ROA.23328-29.

Plaintiffs filed a post-trial motion pursuant to Rules 50 and 59, arguing that their self-serving testimonials had to be accepted as true under Rule 50, despite all contrary evidence.[18] The court declined to disturb the jury's verdict, reasoning that "plaintiffs' argument misapprehends the law and omits evidence presented at trial." ROA.24014. The court found the jury heard evidence "that negated the reasonableness of the plaintiffs' estimated hours worked." ROA.24016.

Plaintiffs also requested a new trial under Rule 59, contending that the admission of impeachment testimony and limited evidence about their income

---

[16] ROA.26940, 26943-44.

[17] ROA.27092.

[18] ROA.23696.

prejudiced them. ROA.23696. As to impeachment, Plaintiffs claimed three witnesses—Day, Pearson, and Gannaway—were "undisclosed" and testified beyond impeachment. ROA.24018-19. But these witnesses did not testify to the full extent of their knowledge. Day testified for less than 20 minutes in response to specific statements made by Stanton at trial, contradicting their truthfulness. Pearson gave only 11 minutes' worth of testimony that discredited specific statements made on the stand by McCord. And Gannaway gave approximately 16 minutes of direct testimony rebutting particular statements made by Martin, and discussing instances in which she observed or believed Martin to have been untruthful. ROA.26545-47.

Day's, Pearson's, and Gannaway's testimonies were classic impeachment. The district court properly denied the motion for a new trial, noting its discretion (ROA.24018, 24019), determining "there was no adverse impact on the plaintiffs' substantial rights," and explaining: "This was not 'trial by ambush' as the plaintiffs claim. The plaintiffs knew about these witnesses, as all three worked under the plaintiffs, the plaintiffs discussed these individuals in their depositions, and the witnesses were identified on witness lists weeks before trial." ROA.24019.

The court also denied Plaintiffs' motion for a new trial based on the limited admission of income-related evidence. ROA.24019-22. Hoping to gain a strategic advantage by falsely portraying themselves as poor minimum-wage workers, while hiding their six-figure incomes from the jury, the Plaintiffs moved *in limine* to

preclude *any* evidence of their income, ROA.20954-64, arguing it was completely "irrelevant." ROA.24638-40. Their commission structure and compensation, however, was relevant to the nature of the parties' relationship, why and how the Companies utilized an independent-contractor agency model (ROA.24641-42), and to rebut Plaintiffs' claim that the Companies "willfully" misclassified them in order to under-compensate them. Some evidence of income was also necessary to avoid skewing the facts to suggest Plaintiffs were not compensated for their work on a straight-time basis. ROA.24643.

The district court should have denied the motion *in limine* entirely, but partially granted it, directing the Companies to approach before getting into the Plaintiffs' "total income in a calendar year," allowing the Companies to introduce evidence of the Plaintiffs' expenses, commission structure, and how they were paid. ROA.24644-45. The Court instructed: "[T]he *total dollar amount* of their income on an annual basis is going to be the subject of a motion in limine. *It doesn't mean it's out*. It just means you need to approach before you bring that up in front of the jury. *But the rest of it is fair game*." ROA.24645.

Plaintiffs also attempted to preclude the Companies from discussing "buy out" or "post-termination" payments they received after termination. ROA.24755-58. But the district court agreed such payments were relevant to willfulness. ROA.24758, 24927. In addition, Plaintiffs received a limiting instruction that their

1099 tax forms "are offered only on the issues of … notice, willfulness, and credibility and should not be considered for any other purpose." ROA.25043-44, 25050, 25061.

During trial, Plaintiffs also opened the door for "income" evidence they now challenge. Plaintiffs promised they would prove "that [Farm Bureau's independent contractor] *business model* willfully and recklessly disregarded [the FLSA]." ROA.24767. Counsel reiterated that Plaintiffs brought suit "to *change the model*" and "*fix the business model*." ROA.24774-77. Explaining *how* Agency Managers were compensated, and *why* they were compensated fairly, was fundamental to defending Plaintiffs' attack on the "business model" and suggestions of willfulness.

The Companies never introduced the total annual income of any Plaintiff. ROA.24020. Any generalized income-related evidence admitted was a ***small part*** of the evidence the jury heard. The trial lasted nine days; involved 24 fact witnesses, three experts, and 153 exhibits; and spanned 2,250 transcript pages,[19] and focused largely on the Companies' business, the agency-manager position, and Plaintiffs' agencies, work habits, and work hours. Only a fraction of the exhibits related to income.[20] And the 47 transcript pages highlighted in Plaintiffs' brief where income

---

[19] ROA.24746–ROA.26995.

[20] The exhibits included: (i) nine pay statements from the month before trial, showing the Agency Managers' contractual post-termination payments (*e.g.*,

was mentioned[21] constitute ***a mere 2%*** of the 2,250-page transcript.

In denying Plaintiffs' motion for a new trial, the district court held that "[t]he limited evidence of compensation was [ ] offered to rebut any argument that the plaintiffs were willfully misclassified." ROA.24020. It similarly concluded that redacted tax forms were properly used to "explore the impact that the plaintiffs' side businesses had on" hours worked, and whether plaintiffs provided "notice that they were working overtime" or "objected to their classification, which related to willfulness." ROA.24021.

Plaintiffs now appeal only the denial of their motion for a new trial. The Companies have noticed a conditional cross-appeal to reverse the district court's (1) summary judgment ruling that Plaintiffs were "employees;" (2) denial of their summary judgment motion based on the commission exemption; and (3) denial of their summary judgment motion based on the administrative, executive, and highly compensated exemptions. This Court need not reach the cross-appeal if the jury's verdict is otherwise affirmed.

---

ROA.22807-08, 24955-56); (ii) 12 composite exhibits of *fully redacted* 1099s (*e.g.*, ROA.22787-806); and (iii) a handful of tax schedules for the *outside businesses* of three Agency Managers, some of which were completely redacted (*e.g.*, ROA.23063-66, 25592-96, 22853, 25186-89). All were introduced the support the Companies' defense of willfulness, notice, or hours-worked issues.

[21] Appellants' Br. at 73. Citations to Appellants' Brief are to the ECF page numbers in the document's header.

## SUMMARY OF ARGUMENT

Plaintiffs sought judgment as a matter of law under Rule 50 following trial, but have abandoned that relief on appeal. Now Plaintiffs seek only a new trial based on three arguments. First, Plaintiffs argue that they are entitled to a new trial because, under the "burden-shifting" test in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), their own self-serving testimony on "hours worked" was required to be accepted as true, despite all contrary evidence. The district court properly held Plaintiffs' argument based on *Mt. Clemens* "misapprehends the law" and fails to acknowledge extensive evidence supporting the jury's verdict.[22] The district court should be affirmed because the burden-shifting test does not apply to or bind the ***jury***; there was more than sufficient evidence to support the verdict; and the trial court's decision not to disturb it was squarely within its broad discretion.

Second, they argue that limited testimony by three witnesses, who worked alongside Plaintiffs and impeached their credibility and truthfulness of their testimony, went beyond impeachment and was so prejudicial that the verdict can only be seen as a product of the improper admission of such testimony. In fact, none of the testimony crossed any line established by this Court's prior decisions, and the other testimony offered in defense was so exhaustive that, even *if* the testimony

[22] ROA.24014. Plaintiffs made this "*Mt. Clemens*" argument under Rule 50 below, but on appeal argue it somehow entitles them to a new trial under Rule 59.

challenged by Plaintiffs strayed slightly beyond impeachment, it was necessarily harmless.

Third, Plaintiffs argue that information about their compensation was irrelevant and somehow biased the jury as to their hours worked, though such testimony was a small part of the proceedings. Contrary to Plaintiffs' argument, information on Plaintiffs' compensation and commission structure was relevant to: (i) explaining the relationship between the parties and the nature of their independent-contractor arrangement, (ii) hours worked, given evidence of outside compensation some Plaintiffs received; (iii) the Companies' actual or constructive knowledge of whether Plaintiffs were working overtime; (iv) defending against Plaintiffs' willfulness claim; and (v) credibility, given Plaintiffs' announcement that they were here to "change the business model," among other reasons. Because the court below rightly admitted the challenged testimony, and because the verdict is sufficiently supported without regard to the challenged testimony, there is no reason to overturn the trial court's well-reasoned order.

In sum, the issues presented are plain, and disposition of the appeal obvious. The jury heard two sides of a story. It believed the Companies' side. The notion that the court below abused its discretion in upholding the jury's finding cannot be squared with the highly deferential standard the court was called on to apply, and a

record bursting with evidence that the Plaintiffs did not carry their burden or approach doing so in a credible manner.

## ARGUMENT

### I. PLAINTIFFS HAVE WAIVED ANY ARGUMENT FOR JUDGMENT AS A MATTER OF LAW, SO THIS COURT SHOULD AFFIRM THE COURT'S DENIAL OF PLAINTIFFS' RULE 50 MOTION

At the close of evidence and following the verdict, the Plaintiffs moved for judgment as a matter of law under Rule 50, arguing the Companies failed to rebut their *prima facie* cases of hours worked. ROA.22274-76, 23704-06. Plaintiffs' argument was based on the erroneous notion that the *Mt. Clemens* "burden-shifting" standard applied at trial and eliminated Plaintiffs' burden of proof. The district court reviewed the trial record, and held that "[t]he evidence at trial raised a conflict in substantial evidence on the issue of hours worked," and "[t]he defendants presented sufficient evidence to negate the plaintiffs' estimates and to sustain the jury's findings." ROA.24013-16. The district court then addressed Plaintiffs' ***separate*** arguments for a new trial under Rule 59. ROA.24016-23. None of the Rule 59 arguments concerned *Mt. Clemens* or the sufficiency of the evidence. ROA.24016-23.

In this appeal, Plaintiffs have abandoned any request for judgment as a matter of law; they request only a new trial. Appellants' Br. at 85. This Court should affirm the district court's correct ruling that Plaintiffs' argument that the burden-shifting

test applied at trial and bound the jury to find for them "misapprehends the law," because it improperly invades the province of the jury.

## II. THE COURT SHOULD AFFIRM THE DISTRICT COURT'S DENIAL OF PLAINTIFFS' MOTION FOR A NEW TRIAL

This Court "review[s] the denial of a Rule 59 motion for a new trial for an abuse of discretion." *Merritt v. Texas Farm Bureau*, 2026 WL 321605, at *1–2 (5th Cir. Feb. 6, 2026). The trial court's discretion is exceptionally broad; it "abuses its discretion by denying a new trial only when there is an ***absolute absence*** of evidence to support the jury's verdict." *Id.* (quoting *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 614 (5th Cir. 2018)).[23]

### A. Plaintiffs' Argument For A New Trial Based On Insufficient Evidence Is Meritless and Should Be Denied

#### 1. Plaintiffs' "Burden-Shifting" Argument Was Waived

Plaintiffs' *Mt. Clemens* "burden" argument should be disregarded when considering the court's denial of their Rule 59 motion. It was not presented below and played no role in the trial court's Rule 59 disposition. *Compare* ROA.23698, 23704-06, *with* ROA.23707-12. Plaintiffs have, accordingly, forfeited this argument. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party

[23] Unless otherwise indicated, all emphasis to quotations in this brief is added, and internal quotations and citations are omitted.

forfeits an argument by failing to raise it in the first instance in the district court ….”).

### 2. Plaintiffs Bore The Burden To Prove Hours Worked

Regardless of waiver, Plaintiffs' argument lacks merit. When it comes to hours worked, as with other factual findings, the jury may weigh the evidence and make credibility determinations. Plaintiffs argue their testimony "as to their estimates of overtime hours," *automatically* satisfies "their 'lenient' burden under *Mt. Clemens*," shifting "the burden at trial" onto "Farm Bureau." Appellants' Br. 80-81. They then argue that the Companies did not meet their burden as to some Plaintiffs because they "presented no witnesses with personal knowledge of the[ir] work schedules." *Id.* at 83.[24] For certain others they claim the Companies' evidence did not sufficiently "disprove" their overtime estimates. *Id.* at 86-96.[25]

Aside from misstating the record, it "is not the case" that an employee automatically satisfies his burden by offering self-serving testimony of hours allegedly worked. *See Marshall v. Hope Garcia Lancarte*, 632 F.2d 1196, 1197-98 (5th Cir. 1980). The district court, citing this Court's authorities, explained that this

---

[24] Plaintiffs place Beakley, Blackwell, Henry, Lovelady, Peek, and Wheeler in this category. As shown below, the categorization of the Plaintiffs is immaterial.

[25] Plaintiffs place Stanton, Ferguson, Cook, and Martin in this category. No argument on *Mt. Clemens* grounds has been presented on behalf of McCord or Henry, who have therefore waived appeal on this ground.

Court "has addressed and rejected [Plaintiffs'] position" that "self-serving testimony of estimated overtime hours worked" necessarily satisfies every FLSA plaintiff's "burden under *Mt. Clemens* and provide[s] sufficient evidence to assess damages against the defendants." ROA.24014 (citing cases).

As the district court held, the Plaintiffs' argument "misapprehends the law." ROA.24014. Before any burden "shifts," an employee must first "prove[] that he has ***in fact performed*** work for which he was improperly compensated." *Marshall*, 632 F.2d at 1197-98 (quoting *Mt. Clemens*, 328 U.S. at 687). If the employee "produces ***sufficient evidence*** to show the amount and extent of that work as a matter of just and reasonable inference," ***then*** the burden shifts to the employer to negate "the reasonableness of the inference to be drawn from the employee's evidence." *Id.*

The district court correctly recognized that a plaintiff's estimates ***may*** satisfy the burden of persuasion on hours worked, but such estimates ***do not bind a jury*** to find for the plaintiff. ROA.24014. A long line of authorities supports the court below, holding that while "it is ***possible*** for a plaintiff to meet this [initial] burden through estimates based on his own recollection," *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011), the jury is not required "to accept unquestioningly such testimony." *Wales v. Jack M. Berry, Inc.*, 192 F. Supp. 2d 1269, 1290-91 (M.D. Fla. 1999) (citing *Marshall*). Indeed, this Court has repeatedly rejected the argument that a plaintiff's hours worked testimony is immune from jury scrutiny. *See, e.g.*,

*Rosales v. Lore*, 149 F. App'x 245, 246 (5th Cir. 2005) (employee failed burden where his testimony "strain[ed] credibility"); *Ihegword v. Harris Cnty. Hosp. Dist.*, 555 F. App'x 372, 374-75 (5th Cir. 2014). And there is nothing in *Mt. Clemens* "that would justify such blatant judicial interference with the jury's deliberative latitude." *Thompson v. RCA Corp.*, 1981 WL 2347, at *2 (D.D.C. Oct. 22, 1981).

Nor was it ***the Companies'*** burden to "disprove that these Agency Managers worked some overtime." Appellants' Br. at 84. In FLSA cases, the burden to establish liability remains always on the plaintiff: it is a burden of *persuasion* as to *damages* that shifts once the plaintiff establishes liability. *See Kohl v. Woodlands Fire Dep't, Inc.*, 2007 WL 9735822, at *6 (S.D. Tex. Apr. 16, 2007) ("the court is not required to accept an employee's estimates of hours worked where such evidence lacks credibility.").

A contrary view would improperly invade the province of the jury. As this Court explained in response to a similar argument, "when there has been a ***trial on the merits***, we need not address the sufficiency of the prima facie case, but instead we will proceed to the ultimate question" of whether legally sufficient evidence supports the verdict. *Zamora v. City of Houston*, 798 F.3d 326, 333 (5th Cir. 2015); *Robinson v. Jackson State Univ.*, 714 F. App'x 354, 359 (5th Cir. 2017) ("Following a jury trial … the *McDonnell Douglas* burden-shifting framework 'becomes moot'").

In other words, *Mt. Clemens* applies at summary judgment, where it serves as an evidentiary tool to determine whether a genuine dispute of material fact exists on hours worked, but has no place in the jury's disposition of contested evidence. *Cf. U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713–14 (1983) (observing that "it is surprising to find the parties and the Court of Appeals still addressing the question whether Aikens made out a prima facie case" under a similar balancing test," because "by framing the issue in these terms, they have unnecessarily evaded the ultimate question of discrimination *vel non*").

In sum, the jury was entitled to weigh the conflicting evidence and decide whether it believed each Plaintiff proved that he or she worked over 40 hours in any workweek. Nothing in *Mt. Clemens* required the jury to accept Plaintiffs' disputed view of the facts.

### 3. More Than Sufficient Evidence Supported The Jury's Verdict

Under Rule 50, a court examines whether there was a "conflict in substantial evidence," where "substantial evidence" is "evidence of such quality and weight that reasonable and fair-minded [jurors] in the exercise of impartial judgment ***might*** reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). Under Rule 59, a district court should preserve the verdict unless the evidence "points 'so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary [conclusion].'"

*Cowart v. Erwin*, 837 F.3d 444, 450 (5th Cir. 2016). Under both rules, district courts are required to draw "all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party." *See id.* (discussing Rule 50); *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998) (same, Rule 59).

The district court carefully reviewed the record and concluded that "the evidence at trial raised a conflict in substantial evidence on the issue of hours worked." ROA.24015. It drew example after example from the record in support of its reasoning and conclusions. It noted, for example, that none of the Plaintiffs kept written records of their hours or presented corroborating witnesses to support their estimated hours. ROA.24015. The court also recognized that all of the Plaintiffs testified solely from their memory, and "[s]everal plaintiffs conceded that they could not recall whether they had worked any overtime when questioned about specific weeks." ROA.24015 (citing evidence).

There was, accordingly, a sufficient basis for the jury to conclude that no Plaintiff satisfied their initial burden of persuasion, under Rule 50, as the district court did, or Rule 59, as Plaintiffs now argue. Moreover, the district court found the Companies "presented sufficient evidence to negate the plaintiffs estimates and to sustain the jury's findings." ROA.24015-16. The court cited to testimony from defendants' witnesses contradicting how long certain tasks, like preparing for and

conducting board meetings, should take. ROA.24015. The court noted testimony about some of the Plaintiffs' side businesses, and testimony contradicting the Plaintiffs' claims of spending time training. ROA.24015.

And the court highlighted some Plaintiffs specifically, noting that Cook admitted he ran an antiques business with his wife and could not swear whether he worked more than 40 hours in the many weeks he antiqued with her. This evidence was corroborated by another witness' testimony that "Cook was mostly absent" and that it would "be generous to say [he was physically in the office] 10 to 12 hours a week at the most." ROA.24015-16. An employee who "kept Ferguson's calendar … could not recall any week where he definitely worked over 40 hours." ROA.24016. An agent who had worked with Martin, the trial court wrote, "estimated he worked a total of 25 to 30 hours per week and that the overtime estimates were not accurate." ROA.24016. Another who had worked with McCord called his overtime claims "not true." ROA.24016. And a staff member under Stanton testified said he "[d]efinitely" did not work "20 [hours] overtime." ROA.24016.

The court added that the evidence summarized constituted "just a handful of examples … the jury heard," but was more than enough to establish a conflict in the evidence." ROA.24016. At its core, this appeal boils down to Plaintiffs' contention that no *rational* juror could believe the Companies' witnesses or find that cross-

examination of Plaintiffs undermined their credibility. The record belies that contention. Where "the record demonstrates that there were two sides to this … case," and "[t]he jury heard both sides and chose to believe [the Companies'] view of the evidence," the "***jury has spoken***," and "[i]t is not within the province of this court to disturb a jury's finding which is supported by the record." *Polanco v. City of Austin, Tex.*, 78 F.3d 968, 979-80 (5th Cir. 1996).

Plaintiffs waived any argument that the Companies' witnesses lacked "personal knowledge," *see* Appellants' Br. at 83-85, by failing to raise any such argument in post-trial briefing. That each defense witness had sufficient personal knowledge is a settled aspect of the evidentiary record. To the extent some Plaintiffs assert that the Companies did not sufficiently "negate" their showings on hours worked under *Mt. Clemens* (Appellants' Br. at 86-96), the jury was not ***required*** to credit ***any*** Plaintiff's testimony. On a motion JMOL, "the evidence, as well as all reasonable inferences from it, are viewed in the light most favorable to the verdict." *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 445 (5th Cir. 2001). This standard required the district court to sustain the verdict if the jury found that each Plaintiff failed to make out a *prima facie* case of overtime, or if their showing was overcome by conflicting evidence. *See Young v. Bd. of Supervisors of Humphreys Cnty., Miss.*, 927 F.3d 898, 905 (5th Cir. 2019) (presuming that jury found Board liable under both standards presented to it).

There is no question a conflict in substantial evidence justified giving the case to the jury and leaving its disposition intact. The jury was entitled to judge Plaintiffs' credibility and weigh testimony elicited on cross-examination, from witnesses who worked alongside Plaintiffs, and from evidence of each Plaintiff's performance presented to the jury through testimony of the Companies' executive leadership, who had years, if not decades, of personal knowledge and experience with all of the Plaintiffs. ROA.26739. It was reasonable for the district court, charged with construing the evidence in a manner that preserves the jury's findings, to affirm its verdict. *Cowart*, 837 F.3d at 450. Plaintiffs' contention that the jury's verdict was irrational is meritless.

### B. The Admission Of Impeachment Testimony Was Proper And Does Not Justify A New Trial

Plaintiffs seek a new trial, claiming the district court improperly allowed substantive testimony from three impeachment witnesses—Day, Pearson, and Gannaway—who directly impeached the credibility of Stanton, McCord, and Martin. Appellants' Br. at 54-64. Plaintiffs' argument is without merit.

To begin, the district court's admission of impeachment testimony is subject to a "deferential abuse of discretion standard." *Williams*, 898 F.3d at 615; *see also Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 401-02 (5th Cir. 2003); *United States v. Brock*, 833 F.2d 519, 522 (5th Cir. 1987) (no abuse of discretion in allowing testimony of undisclosed witnesses). "When a party fails to

show that excluding the evidence would have altered the outcome of the case, the party has not met its burden for a new trial." *Echeverry v. Jazz Casino Co.*, 988 F.3d 221, 235 (5th Cir. 2021); *see also Munn v. Algee*, 924 F.2d 568, 573 (5th Cir. 1991). "Where appropriate, [the Court] may also apply the doctrine of invited error …" *Caskey v. Man Roland, Inc.*, 1996 WL 197370, at *2 (5th Cir. 1996).

First, Day, Pearson, and Gannaway were hardly undisclosed. They were identified during the depositions of Stanton, McCord, and Martin as individuals who worked in their respective agencies. ROA.21777-83, 14903-05, 24018. The Companies' supplemental disclosures identified secretaries and agents who worked in the same office as each Plaintiff as individuals with knowledge of relevant facts, including Plaintiffs' schedules, hours worked, and work activities. ROA.21782, 21836, 21906-07, 21910-11, 21920. Day, Pearson, and Gannaway were also identified as potential witnesses in the Companies' pretrial disclosures. ROA.24019. Magistrate Manske commented that Plaintiffs "were actually in a better position [than Defendants] to readily identify and interview the individuals working beneath Plaintiffs...." ROA.14904. Even so, Plaintiffs complained about the adequacy of the Companies' Rule 26(a)(1) disclosure, and the district court limited Day's, Pearson's, and Gannaway's testimony to impeachment purposes. ROA.22239-40.

### 1. The Witnesses Offered Impeachment Evidence

Offering little analysis, Plaintiffs complain that Day's, Pearson's, and Gannaway's testimony was not impeachment evidence but "went to the heart of the question asked of the jurors: how many hours the Agency Managers worked." Appellants' Brief at 58-59.

***Joan Day.*** Day was the county secretary in Stanton's Dickens County office. ROA.26366-67. She testified on direct for less than 20 minutes and contradicted specific factual statements made during Stanton's trial testimony. For example, Stanton testified that he "spent every Thursday in Dickens County," (ROA.25528), but Day testified that Stanton's visits lasted 15-30 minutes, enough time to sign her checks. ROA.26730, 26372-73, 26378-78. Day refuted Stanton's claim that he performed all his regular activities while undergoing cancer treatment, testifying that Stanton did not come to that office at all between August 2015 to November 2015. *Compare* ROA.26373, *with* ROA.25542. Day also contradicted Stanton's testimony about the preparation for, and the length and number of, board meetings Stanton attended. *Compare* ROA.26375, 25527, *with* ROA.26375, 6375-77.

***Mary Pearson.*** Pearson worked for McCord in Jones County, testifying on direct for only 11 minutes. ROA.26523-36. Pearson contradicted McCord's testimony that he routinely worked through lunch, testifying he was not in the office during lunch and often did not return afterward. *Compare* ROA.25395, *with*

ROA.26528-29. Pearson refuted McCord's testimony about routinely working late at the office. *Compare* ROA.25394-95, *with* ROA.26526-28. She also testified that her duties included preparing for board meetings, which contradicted McCord's claim that he spent two hours preparing for board meetings. *Compare* ROA.26531, *with* ROA.25401.

***Shannon Gannaway.*** Gannaway, an agent in Martin's agency, testified on direct for about 16 minutes. ROA.26536-57. She contradicted Martin's claims that he met weekly with agents and worked through lunch. ROA.26542-53, 26546, 24879, 24881. She testified Martin only sporadically held meetings with agents and would go to lunch for "a couple of hours" "[m]ost of the time." ROA.26542-53, 26546. Gannaway denied Martin trained her or regularly conducted reviews with her. ROA.26439. She recounted several instances where she believed Martin had been dishonest. ROA.26545-49.

Ultimately, the testimony permitted by the district court was consistent with this Court's decision in *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993), which defines impeachment evidence as evidence "offered to discredit a witness," and "to reduce the effectiveness of" the witness's testimony. The Companies did not solicit testimony from Day, Pearson, or Gannaway on the ultimate question of whether Plaintiffs worked overtime, and their testimony was properly admitted.

### 2. The Witnesses' Testimony Did Not Affect Plaintiffs' Substantial Rights

Regardless of whether their testimony strayed from pure impeachment, Day, Pearson, and Gannaway were three of 14 witnesses called by the Companies, in a trial with 27 total witnesses. They testified on direct for less than an hour combined. ROA.24018. The "improper admission of evidence that is merely cumulative on matters shown by other admissible evidence is harmless error." *HCI Chemicals (USA), Inc. v. Henkel KGaA*, 966 F.2d 1018, 1021 (5th Cir. 1992). Because there was ample other evidence to support the jury's findings that Plaintiffs did not work overtime, any error in admitting Day's, Pearson's, and Gannaway's testimony was harmless.

For example, Stanton conceded that he could not provide specifics about his activities or hours in any given week (ROA.25568-69) and admitted to having "virtually no life insurance sales" and very few new customers during the relevant period. ROA.25630-39. Stanton's plummeting production coincided with steep increases in the income generated from his family farm business, and his own cancer diagnosis and treatment, which undercut his overtime claims. ROA.25580-614, 25542-43. Vicky Abell, a secretary in Stanton's Crosby County agency, also discredited Stanton, testifying Stanton routinely golfed two days a week and rarely took his laptop home. ROA.26388, 26390. Abell testified Stanton worked "[m]aybe 20 [hours] the total week." ROA.26402. Other witnesses also contradicted Stanton.

*See, e.g.*, ROA. 23244, 23259-64, 26702, 26771-73, 26793-96.

McCord effectively ***conceded*** he had no overtime during the relevant period. ROA.25421-22.[26] Nancy Sparks, an agent in McCord's Fisher County agency, disputed McCord's testimony, ROA.26494-97, 26500-02, 26503-04, 26507, 26509-10, as did the Companies' corporate witnesses. ROA.26702-03, 26808-09.

Martin exaggerated his overtime hours repeatedly and lost all credibility with the jury. His testimony that he recruited constantly, trained agents, and did policyholder reviews was contradicted by John Brown, an agent who worked with Martin. Brown testified to frequent turnover in the agency due to Martin's lack of training. ROA.25569-73. Brown also refuted Martin's exaggeration that Taylor County board meetings were hours-long affairs that went late into the night. *Compare* ROA.24876, *with* ROA.26577-78. And Brown told the jury that Martin spent significant time engaging in personal activities throughout the workday and frequently not working on Fridays. ROA.26579-85. The Companies' Associate State Sales Manager also testified Martin had zero policyholder reviews during the relevant period, debunking Martin's claim of working on reviews late at night. ROA.26179-86, 23259-64.

---

[26] McCord admitted he was not seeking overtime for the period of wife's illness—a period that overlapped with the period of his alleged damages. ROA.25421-22.

### 3. The Plaintiffs' Authorities Are Inapposite

Plaintiffs rely on *Chiasson* and *Olivarez v. GEO Group, Inc.*, 844 F.3d 200 (5th Cir. 2016), which are distinguishable.

*Chiasson* concerned an undisclosed surveillance tape offered to impeach a Jones Act plaintiff's damages claim. 988 F.2d at 514-16. This Court concluded that the tape's purpose was not "solely for impeachment" because it was offered to disprove the amount of the plaintiff's damages. *Id.* at 517. *Olivarez* involved a discovery dispute and sanction award for undisclosed evidence. 844 F.3d at 203. It did not evaluate a trial court's decision to admit or exclude evidence, or an appeal seeking a new trial after a jury verdict.

Plaintiffs also cite *Swearingen v. Gillar Home Health Care, L.P.*, 759 F. App'x 322 (5th Cir. 2019), *Carlson v. Bioremedi Therapeutic System, Inc.*, 822 F.3d 194 (5th Cir. 2016), and *Jauch v. Corley*, 830 F.2d 47 (5th Cir. 1987), which do not support a new trial. *Swearingen* involved error in the trial court's admission of witness testimony by deposition when the witness was *not* unavailable. 759 F. App'x at 323-25. *Jauch* involved a similar error. 830 F.2d at 50. And *Carlson* involved a district court's failure to exercise its gatekeeping function under Rule 702. 822 F.3d at 198-202. None of these cases establish Plaintiffs' entitlement to a new trial.

### C. Generalized Income Evidence Was Properly Admitted

Plaintiffs complain that the Companies "focus[ed]" on their compensation and were allowed to "hammer how much money" they made (Appellants' Br. at 27), and that the admission of generalized income evidence was designed to cause the jury to conclude the Plaintiffs did not "need or deserve overtime." *Id*. at 65. Their argument is inaccurate and relies on cherry-picked testimony. ROA.22357. Plaintiffs ignore the strict limits imposed by the district court on the income information allowed—limits which demonstrated the district court's thoughtful analysis of Plaintiffs' concerns about prejudice. It is not this Court's role to second-guess the district court's reasonable exercise of discretion and balancing of trial evidence. *United States v. Fields*, 483 F.3d 313, 354, 356 (5th Cir. 2007) (affording "an especially high level of deference" to a district court's Rule 403 decisions).

#### 1. Generalized Evidence Of The Plaintiffs' Income Was Relevant

Prior to trial, the district court ruled that Plaintiffs had been misclassified as independent contractors and were instead "employees" under the FLSA. ROA.14348-49. Income-related evidence was relevant—and properly introduced—to rebut Plaintiffs' claims that the Companies had knowledge of alleged overtime and ***willfully*** misclassified them, and to question the credibility of some Plaintiffs' overtime estimates. Testimony regarding Plaintiffs' income was also relevant to

challenge their credibility in attacking the Companies' business-model, which they injected as a core theme of their case.

**a. Hours Worked**

Because some Plaintiffs reported outside business activities on their tax returns, the Companies introduced redacted tax schedules to explore the impact of their side businesses on Plaintiffs' claimed ***hours worked*** (by, for example, exploring how many hours per week the Agency Manager devoted to a side business on top of the claimed hours devoted to their insurance agencies).[27] The jury also heard testimony about Plaintiffs' commission structure,[28] with Plaintiffs' expert agreeing that 90% of their income consisted of renewal and overwrite commissions on the work of agents under them, ***not*** from Plaintiffs' own work.[29] Thus, any reference to their "six-figure income" in a case evaluating the hours each Plaintiff worked must be examined in conjunction with testimony that the vast majority of that income was *not* from the Plaintiffs' work. Plaintiffs acknowledge it was just as plausible for the jury to have correlated a high income to longer hours. Appellants'

---

[27] ROA.23007-08, 25368-70, 23063-66, 25592-96, 22853, 25186-89.

[28] Agency Managers received commissions and bonuses not only on their personal sales (new and renewal), but also significant override commissions on new and renewal sales of all the agents who worked under them. ROA.26176-77, 26789-91.

[29] ROA.26034-35.

Br. at 68. The jury's decision not to weigh such evidence in Plaintiffs' favor does not make the limited income evidence irrelevant to the hours-worked issue.

### b. The Knowledge Requirement

Whether the Companies had actual or constructive knowledge that each Plaintiff worked overtime was a core jury question. ROA.23322-25; *Merritt*, 2026 WL 321605, at *1-3. The jury was entitled to hear that Plaintiffs were sophisticated business operators who worked with certified public accountants to file complex tax returns and take significant deductions for expenses that employees are not entitled to take.[30] The fact that Plaintiffs reported themselves to the IRS as independent contractors was relevant to the knowledge element (as well as to their credibility). Plaintiffs conceded that none of them followed the Form 1099 Box 7 instructions to file their taxes as employees or ask the Company for a correction if they believed they were misclassified, and none advised their accountants that their classification was wrong.[31] Each admission was relevant to the Companies' knowledge of overtime, or lack thereof, and to willfulness.

---

[30] *E.g.*, ROA.24960-64, 25100, 25111, 25185-89, 25310-11, 25368-69, 25494-97, 25581-82, 25717-22, 25747-48.

[31] ROA.24948-55, 25139-41, 25222-25, 25307-09, 25365-67, 25380-82, 25491-93, 25751-53, 25825-26.

### c. Willfulness

An employer's FLSA violation is "willful" only if it "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Plaintiffs were, thus, required to show the Companies ***knew*** they were misclassified as independent contractors or, at minimum, were on notice of potential FLSA violations. *See Mozingo v. Oil States Energy, Inc.*, 661 F. App'x 828, 830-31 (5th Cir. 2016).

To meet their burden, Plaintiffs presented an HR professional who testified that the Companies' failure to conduct an assessment of Agency Manager classification was "unacceptable."[32] The Companies countered with evidence explaining why they did not conduct such an analysis, including how the commission structure benefitted Agency Managers,[33] that the Companies believed their model was consistent with independent-contractor status,[34] and they were not aware of any complaints from Agency Managers or regulators regarding the model.[35] Evidence of post-termination payments showed the Companies met their contractual obligations to Plaintiffs and provided a benefit not available to the Companies'

---

[32] ROA.25901, 25916-17, 25290, 25923.

[33] ROA.26175, 26789.

[34] ROA.26497, 26813-14, 26877-79, 26884-86.

[35] ROA.25941-44, 26224-25, 26783-87, 26446-49.

employees. ROA.26783. As the district court noted, the pay statements did not reflect "gross amount, the big numbers" that would otherwise reflect their total commissions while under contract. ROA.24926-27. And the annualized totals—which ranged between $15,312.96 and $37,128.96—can hardly be said to be inflammatory or prejudicial.

Plaintiffs have failed to cite a single case where the admission of similar income evidence in an FLSA case constituted reversible error and warranted a new trial. In contrast, in denying Plaintiffs' motion for new trial, the district court cited *Hart v. RCI Hospitality Holdings, Inc.*, 90 F. Supp. 3d 250 (S.D.N.Y. 2015), a case in which in plaintiffs' pay was "obviously relevant" to the issue of willfulness. *Id.* at 258-59. The *Hart* court declined to allow the plaintiffs to keep the fact of such payments from the jury, explaining it "would be ***grossly misleading***." *Id.* at 258.[36] The district court below was equally reasonable and should be affirmed.

**d. Credibility**

Finally, generalized income testimony was introduced to challenge the credibility of Plaintiffs' claimed desire to change the Farm Bureau independent

[36] Contrary to Plaintiffs' contention (Appellants' Br. at 71-72), whether the Companies willfully violated the FLSA is measured at the time they were under contract, not 70 years ago. *See Zannikos v. Oil Inspections, Inc.*, 605 F. App'x 349, 360-61 (5th Cir. 2015) ("willfulness" exists when "an employer actually knew its pay structure violated the FLSA or ignored complaints that were brought to its attention").

contractor business model. For example, although acknowledging his lawyer's opening statements about changing the Farm Bureau system, Beakley conceded *he* had no reason to do so because he liked the money he made. ROA.25316-17. Cook never told anyone at the Companies that he didn't agree with the Farm Bureau system because he "liked the money." ROA.25235. McCord, likewise, admitted he liked the Farm Bureau model because it allowed him to make good money. ROA.25484-87. And Ferguson testified that he didn't want to be an employee because being an independent contractor allowed him to "make a lot of money." ROA.25779-81.

That Plaintiffs, as agency managers, were paid commissions for sales of insurance products predominately made by the agents working under them, and were highly compensated for those sales, also helped show that the Companies' independent-contractor classification was not motivated by a willful desire to underpay Plaintiffs. That the district court did not allow Plaintiffs to "grossly mislead" the jury by concealing these facts does not constitute substantial prejudice.

### 2. Plaintiffs Failed To Establish Prejudice

Plaintiffs rely on Rule 403 to claim that generalized income evidence should have been excluded as unfairly prejudicial. Appellants' Br. at 62. But "'[u]nfair prejudice' as used in Rule 403 does not encompass testimony that is merely adverse to the opposing party. Virtually all evidence is prejudicial to one party or another;

otherwise, it would likely not be relevant at all." *Cruz v. Cervantez*, 96 F.4th 806, 814 (5th Cir. 2024).

For example, Plaintiffs complain about Ingram's inadvertent comments about the "average" agency manager income (Appellants' Br. at 30), which was elicited in response to questions about the Companies' business model that Plaintiffs attacked at trial. ROA.26224-26. The district court struck Ingram's testimony and instructed the jury to disregard it. ROA.26225.[37] When viewed in the context of a lengthy trial with multiple witnesses, Plaintiffs have failed to show how this stricken testimony had a "substantial impact" on the jury's verdict on hours worked to warrant a new trial. *See United States v. Perez*, 223 F. App'x 336, 346-47 (5th Cir. 2007).

Plaintiffs' cite to *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150 (1940), does not support their prejudice argument. Appellants' Br. at 75. *Socony-Vacuum* involved an appeal of co-conspirator convictions for anti-trust violations. 310 U.S. at 166. The *defendants* objected to certain statements made during the government's opening and closing depicting them as having significant wealth and influence and characterizing them as millionaires and billionaires. *Id*. at 237. Although recognizing that "appeals to class prejudice are highly improper," the Supreme Court did *not* find that the statements constituted "prejudicial error." *Id*. at

[37] Plaintiffs moved for a mistrial, which was denied. ROA.26225-26. They did not appeal that ruling.

239. In *Socony-Vacuum*, like here, there was significant evidence otherwise supporting the jury's verdict. *Id*. And the jury here was specifically instructed not to let "bias, prejudice or sympathy play any part in your deliberations." ROA.23314.

*Helix Energy Solutions Group v. Hewitt*, 598 U.S. 39, 59 (2023), did not address the admissibility of income evidence at a trial. Indeed, the plaintiff's compensation in *Hewitt* (in excess of $200,000 annually) was discussed throughout the case, and neither the Fifth Circuit nor the Supreme Court ever suggested that it was not proper to reference a plaintiff's compensation in an overtime case. *Karna*[38] and *Wilkins*[39] (Appellants' Br. at 66-67) are likewise inapposite. *Karna* involved an appeal of a jury's finding that an employee met the computer-professional exemption under the FLSA, where the jury considered the relationship between the employee's salary and the wages of non-exempt workers. 609 F. App'x at 819. In *Wilkins*, the trial court determined that an employee's pay level was not a factor in evaluating the applicability of the outside sales exemption under the Illinois Minimum Wage Law. 2019 WL 13251179, at *2-3. Neither case concerns the admissibility of generalized income evidence on the issues involved here.[40]

---

[38] *Karna v. BP Corp. N. Am.*, 609 F. App'x 814, 819 (5th Cir. 2015).

[39] *Wilkins v. Just Energy Group, Inc.*, 2019 WL 13251179, at *1 (N.D. Ill. Aug. 4, 2019).

[40] Likewise, *Noviello v. Holloway Funding Group*, 2023 WL 2195768, at *3 (N.D. Tex. Feb. 23, 2023), has nothing to do with the FLSA issues in this case. And

### 3. The Admitted Testimony Does Not Require Reversal

Plaintiffs' only support for their theory that admitted income testimony prejudiced the jury's determination of their hours worked is the fact that the jury ruled against them. Appellants' Br. at 78. This is pure speculation and ignores all of the other evidence showing Plaintiffs' testimony on their hours worked was grossly exaggerated and lacked all credibility.

Prohibiting the Companies from referencing or introducing evidence that the Plaintiffs' commission income was intended to compensate them for ***all*** hours worked would have left the jury with the false impression that the Companies made them work overtime without *any* compensation. And had the court excluded all income evidence, it would have prejudiced the Companies' defense on willfulness and other issues. By filing this lawsuit seeking overtime pay, Plaintiffs put their compensation directly at issue for the issues stated. The district court's evidentiary rulings were proper and do not come close to reversible error. ROA.24020. This Court should affirm the judgment.

---

the string of non-FLSA lower-court decisions at footnote 248 involved attempts to inject income that was not relevant to the pending claims (*St. Andrews*), related to dismissed claims (*Childers* and *Owens*), or involved bifurcated proceedings (*Dubea* and *Ainsworth*).

## THE COMPANIES' CONDITIONAL CROSS-APPEAL

## III. THE COURT SHOULD REVERSE THE DISTRICT COURT'S DISPOSITIONS ON THE "COMMISSION" EXEMPTION

This case should never have proceeded to trial in the first place because the Plaintiffs were exempt from overtime requirements under the "Commission Exemption" in Section 207(i) of the FLSA. *See Taylor v. HD & Assocs., L.L.C.*, 45 F.4th 833, 836-39 (5th Cir. 2022). The district court applied its reasoning from an order issued in a related case, which opined that "the insurance industry lacks a retail concept" and is outside the scope of Section 207(i). ROA.21763-64 (citing *Merritt v. Texas Farm Bureau*, 673 F. Supp. 3d 859, 865-66 (W.D. Tex. 2023), and stating *Merritt*'s "reasoning … applies equally here and is" incorporated by reference).

The district court's holding was mistaken in *Merritt* and is mistaken here. Section 207(i) expressly applies to *any* "employer," and the conclusion below conflicts with DOL's most recent interpretative regulation's purpose: "to promote consistent treatment across ***all industries*** … when determining eligibility for … the [Section 207(i)] exemption." 85 Fed. Reg. No. 97, at 29,867 (the "2020 Rule").

### A. Section 207(i) Applies To Any "Employer"; It Does Not Exclude The Insurance Industry From Its Scope

Section 207(a) imposes an overtime wage requirement for "a workweek longer than forty hours." 29 U.S.C. §207(a)(1). Subsection (i) of that same section contains the commission exemption, which provides:

> ***No employer*** shall be deemed to have violated subsection (a) by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. §207(i). By its plain language, the statute makes the commission exemption available to all "employer[s]" who pay "commissions on goods or services" and otherwise meet the requirements of the statute. Insurance policies are "goods" within the meaning of the FLSA.[41] On its face, Section 207(i) is available to all businesses covered by the overtime requirement in Section 207(a).

The "[i]nterpretation of a statute must begin with the statute's language." *Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*, 490 U.S. 296, 300 (1989). Section 207(i) makes no mention of insurance and contains no terms categorically excluding insurers from its scope. It applies to all "employer[s]" and "*any* employee" of a "retail or service establishment." The term "any" as used in the FLSA is "best read to mean 'one or some indiscriminately of *whatever* kind.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012). Just as Section 207's other exemptions do not exclude the insurance industry, neither does

[41] *See* 29 U.S.C. §203(i) ("goods" include any "articles or subjects of commerce of any character, or any part or ingredient thereof"); 29 C.F.R. §776.20(b) ("*Insurance policies are 'goods' within the meaning of the Act.*").

Section 207(i).[42] The court's first step is therefore "the last," and the "judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

**B. DOL's 2020 Rule Makes Clear That The Commission Exemption Is Available To All Industries**

On May 19, 2020, the DOL repealed a "partial list of establishments" it had deemed "unable to qualify" for the commission exemption because they had "no retail concept." 85 Fed. Reg. 29,867. One entry included: "Insurance; mutual, stock and fraternal benefit, including insurance brokers, agents …." 29 C.F.R. §779.317 (repealed). The 2020 Rule withdrew this list and recognized that the exemption. 85 Fed. Reg. at 29,868-29,869.[43]

DOL's 2020 Rule was "intended to promote consistent treatment across *all industries*" under Section 207(i). 85 Fed. Reg. 29,867. It "*permits the reevaluation* of an industry's retail nature as developments progress," and states "[e]stablishments which had been listed as lacking a retail concept may now assert … that they have a retail concept and *may be able to qualify* as retail or service establishments." *Id.* at 29,867, 29,868. Going forward, DOL will treat "*all* establishments equally under

[42] When Congress intends to include or exclude an industry from an FLSA exemption's scope it does so *expressly*. *See, e.g.*, 29 U.S.C. §207(l) (applicable to "any employee in *domestic service*"); *id.* §207(m) (applicable to "*tobacco industry*").

[43] DOL also repealed a partial list of establishments that "may be recognized as retail." *Id*. at 29,867.

the same standards," and "*[a]ll* establishments may be recognized as retail if they satisfy these criteria." *Id*. at 29,869.

The 2020 Rule confirmed the plain-text reading of Section 207(i), which does not exclude any industries.

### C. Appellants' Insurance Agencies, And Their Compensation, Satisfied All Requirements Of Section 207(i)

As the district court recognized, the commission exemption has three requirements: (1) the employee must be working in a "retail or service establishment," (2) the employee's regular rate of pay must be more than one and one-half the minimum wage, and (3) more than half of the employee's compensation must represent "commissions on goods or services." *Merritt*, 673 F. Supp. 3d at 862. All were satisfied.

The Plaintiffs were paid commissions and did not contest that each one's rate of pay exceeded one and one-half times the applicable minimum wage.

The only contested issue was whether the *agencies* each Plaintiff managed were "retail or service establishments." Based on the undisputed facts, they were. The term "establishment" refers to a "'distinct physical place of business' rather than to 'an entire business or enterprise.'" 29 C.F.R. §§779.23, 779.303. But instead of evaluating whether the agencies sold "goods" at retail, the court erroneously analyzed whether the entire insurance industry had a "retail concept." *Merritt*, 673 F. Supp. 3d at 865-67.

According to the undisputed testimony of insurance-industry veterans with personal knowledge, at each of the agencies, Plaintiffs and their agents sold various insurance products issued by the Companies, and dozens of retail insurance products issued by other companies (called "brokerage" products). *E.g.*, ROA.17364, 17452-53. Each agency was strategically located in a business district, "open to all members of the general public," served walk-in business, and marketed these products "on a retail basis to consumers and members of the general public." *E.g.*, ROA.17455-56, 17523-25.

Through advertising, each establishment invited the public to its location to potentially purchase insurance. *E.g.*, ROA.17385, 17424-28. Each had an "open" door policy, so any member of the public could walk in or make an appointment during normal business hours and receive service. *E.g.*, ROA.17368-69, 17383-85. Each had processes to serve prospective customers who might call or walk-in for an appointment and assist customers with policies and premiums. ROA.17456.

When customers purchase a TFB policy, they also become members in the local non-profit farm bureau for an annual fee of $25 to $50. ROA.17365. Anyone can be a member, and there is no requirement that a member be affiliated with agriculture. ROA.17365. Policies "are offered and sold to all members of the community[.]" ROA.17365. No membership is required for brokerage or to renew life insurance policies from SFB Life. ROA.17365.

The agencies also served the convenience of the community. ROA.17457, 17608. They embedded themselves into the fabric of the community through centralized locations, open-door policies, advertising, and community outreach.[44] As Ernest Csiszar, the Companies' insurance-industry expert, explained:

> [T]he Farm Bureau Companies distribute and sell all their insurance products, … entirely in the retail markets, consistent with other similar retail operations across the insurance industry … [T]he Companies' products [are sold] from agency establishments … serving the general public. … Their only channel of distribution is the "bricks and mortar" local agency location, staffed by the agency manager, agents, secretaries, and receptionists that are part of their community.

ROA.17519, 17523.

The agencies did not operate as a "middleman," distributor, or reseller. ROA.17457, 17524-25. Policies were purchased by consumers for themselves, "not for resale." ROA.17457, 17524-25, 17582. Policyholders were at the end of the distribution chain, as the "end user" of the policy. ROA.17457, 17524-25. Agencies sold policies in small quantities, or one policy at a time. ROA.17457, 17524-25.

[44] The Companies' summary judgment motion included a detailed description of each agency office (ROA.17334-45), along with photographs. ROA.17371-77, 17386-93, 17404-17, 17430-49.

The plain meaning of "retail" is the sale of goods to the public in relatively small quantities for use or consumption rather than for resale.[45] Because there is no dispute that insurance policies are goods, the agencies are "retail" establishments. And because Section 207(i) is unambiguous, there is no need to consult extrinsic sources, like regulations or legislative history. All three requirements were satisfied.

### D. The District Court Erred In Analyzing Section 207(i)

#### 1. The District Court Incorrectly Found *Mitchell* "Controlling"

The district court adopted the argument that a 1959 Supreme Court decision was "controlling" and had held that an insurance agency could not satisfy the commission exemption in Section 207(i). *Merritt*, 673 F. Supp. 3d at 866 (citing *Mitchell v. Ky. Fin. Co.*, 359 U.S. 290 (1959)). This was error.

*First*, *Mitchell* did not even construe Section 207(i)'s commission exemption. *Mitchell* was decided in *1959*, and Section 207(i) was not enacted until 1961. Pub. L. 87-30, §6(g). *Mitchell* addressed whether a *personal loan company* was a "retail or service establishment" under the 1949 amendment to ***Section 213(a)(2)*** of the FLSA. 359 U.S. at 292. Section 213(a)(2), since repealed, was a different statute known as the "***intrastate business exemption***," which had used the term "retail or

[45] *Retail*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/retail; *Retail*, *The Britannica Dictionary*, https://www.britannica.com/ dictionary/ retail.

service establishment" in a different context. As Judge Posner explained, "the two [exemptions] serve different purposes." *Alvarado v. Corp. Cleaning Servs., Inc.*, 782 F.3d 365, 369-71 (7th Cir. 2015) (criticizing courts that "have woodenly ported the definition from Section 213(a)(2) to the commission exemption").

*Second*, *Mitchell* did ***not involve insurance*** or insurance agencies. It involved *loan companies* that "concede[d] that they are not engaged in the sale of 'goods.'" 359 U.S. at 293. To resolve whether they were a "retail or service establishment" under Section 213(a)(2), the Court turned to legislative history showing that certain drafters of the 1949 amendment did not intend to embrace "banks, insurance companies, building and loan associations" and others. *Id.* at 295. The Court's decision had nothing to do with insurance agencies or the retail sale of insurance policies. The words "insurance companies" appear in *Mitchell* only because they were sandwiched between "banks" and "building and loan associations" in a committee report relating to a different statutory provision.

*Third*, Section 207(i) is unambiguous. "[T]he Supreme Court has stated repeatedly that where a statute's text is clear, courts should not resort to legislative history." *Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018). Rewriting Section 207(i) based on legislative history of Section 213(a)(2) is improper.

*Finally*, *Mitchell* relied on the doctrine that FLSA exemptions should be "narrowly construed." 359 U.S. at 295. The Supreme Court *rejected* that principle

in *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 90 (2018). The other non-binding authorities the court cited are not applicable or persuasive. *Merritt*, 673 F. Supp. 3d at 866.[46]

Far from "controlling," *Mitchell* provides no justification for rewriting Section 207(i) to exclude the "insurance industry" from its scope.

### 2. The District Court's Reliance On 29 C.F.R. §779.414 To Exclude The Insurance Industry From Section 207(I) Was Error

Citing 29 C.F.R. §779.414, the court opined that "using common sense and common parlance, this Court finds it hard to fathom a retail concept in Defendants' insurance businesses." *Merritt*, 673 F. Supp. 3d at 866. Section 779.414 lists certain establishments, like those selling "furniture," "bedding," "appliances," and "clothing" as *examples* of ones "Section 7(i) was enacted to relieve." The court justified excluding the insurance industry from the commission exemption based on its subjective view that insurance is different from the businesses listed in §779.414.

But §779.414 does not purport to list every type of business within Section 207(i)'s scope. It states "[t]here may be ***other*** segments in retailing" besides

---

[46] *Parks v. Eastwood Insurance Services, Inc.*, 2003 WL 25682287, at *3 (C.D. Cal. Feb. 24, 2003), and *Burden v. SelectQuote Insurance Services*, 848 F. Supp. 2d 1075, 1085 (N.D. Cal. 2012), issued before *Encino Motors* and the 2020 Rule. *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 628 (11th Cir. 2004), did not resolve any claim under the Commission Exemption.

those listed, and "*[e]ach such situation will be examined*" individually. Section 779.414 makes clear that its examples are *not* exclusive. Read properly, it does not conflict with the 2020 Rule or the statute, which make the commission exemption available to "all industries." 85 Fed. Reg. 29,867.

Were there a conflict, §779.414 would lack the "power to persuade" and should be ignored. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Section 207(i) has no limiting language, so §779.414's examples of the "types" of retailers some members of Congress had in mind when enacting it are not germane.

#### 3. The District Court's Reliance On 29 C.F.R. §779.316 To Exclude The Insurance Industry From Section 207(I) Was Error

The court also cited 29 C.F.R. §779.316, stating it was "still in effect" and states: "[t]he term 'retail' is alien to some businesses or operations. For example, transactions of an *insurance company* are not ordinarily thought of as retail transactions. … As to establishments of such businesses, therefore, a concept of retail selling or servicing does not exist." *Merritt*, 673 F. Supp. 3d at 865 (emphasis added by district court).

Like the *Mitchell* decision, the 50-year-old guidance found in §779.316[47] applied to the repealed ***intrastate business exemption***, not Section 207(i).

[47] Section 779.316 was promulgated April 9, 1970. 35 Fed. Reg. 5,856.

Regardless of whether §779.316 is "still in effect," it cannot be read to conflict with the statute or contradict the more recent guidance set forth in the 2020 Rule, making clear that the commission exemption is available to all industries.[48]

This Court should reverse the district court's error of law in denying the Companies' summary judgment under Section 207(i), and vacate the contrary summary judgment in favor of the Plaintiffs.

## IV. THE COURT SHOULD REVERSE THE DENIAL OF SUMMARY JUDGMENT TO THE COMPANIES BASED ON THE ADMINISTRATIVE, HIGHLY-COMPENSATED, AND EXECUTIVE EXEMPTIONS

The FLSA exempts "any employee employed in a bona fide executive, administrative, or professional capacity" from overtime requirements. 29 U.S.C §213(a)(1) (the "EAP Exemptions"). DOL issued rules requiring that, to qualify for each exemption, an employee perform certain duties, and separately, receive a minimum level of compensation paid on a "salary basis" of "not less than $455 per

[48] In connection with repealed Section 213(a)(2), §779.316 created the requirement of a "retail concept," "whatever that might mean." *Alvarado*, 782 F.3d at 370. A "retail concept" is not a requirement of Section 207(i), but the Companies proved one anyway. An establishment with a "retail concept" typically "sells goods or services to the general public," "serves the everyday needs of the community," operates "at the very end of the stream of distribution," disposes of its services "in small quantities," and is not a manufacturer. 29 C.F.R. §779.318(a). As discussed above, the agencies do all of these things. The Companies' motion for summary judgment addressed these factors in even more detail and showed why there was no genuine issue of material fact on any of them. ROA.17348-350.

week" (or $1,292 per month). 29 C.F.R. §§541.200(a)(1), 541.600(b).[49] DOL has also implemented regulations exempting "highly compensated employees" from overtime requirements; such employees have total annual compensation of at least $100,000, perform at least one administrative/executive duty, and satisfy the salary-basis test. 29 C.F.R. § 541.601. The Companies proved these requirements below, and the district court's order to the contrary (ROA.14365-66, 14763) should be reversed.

### A. All Plaintiffs Performed Administrative And Executive Duties

The Companies presented undisputed evidence showing Plaintiffs were responsible for the "duties" required to satisfy the administrative exemption. The Companies also demonstrated that Plaintiffs worked in an executive capacity and satisfied the requirements for that exemption. ROA.9447-48, 17276-78, 17281-85, 17311-12.

### B. 11 Of The 12 Plaintiffs Satisfied The Highly Compensated Exemption's Duties And Total Compensation Requirements

With respect to the highly compensated exemption ("HCE"), it was undisputed that the "total annual compensation" of 11 of the 12 Plaintiffs exceeded $100,000 for every relevant year, as required by the HCE regulations. 29 C.F.R.

[49] The regulations applicable to the Agency Managers are at 69 Fed. Reg. 22,260 *et seq*. (Apr. 23, 2004).

§541.601(a); ROA.8678, 8685, 15307, 15314, 17278-79. Plaintiffs easily satisfied the HCE duties requirement because it demands only "one or more" of the duties or responsibilities applicable to an administrative or executive employee. 29 C.F.R. §541.601(a).

### C. Plaintiffs' Compensation Satisfied The Salary-Basis Test

Plaintiffs conceded these material facts and submitted no contrary evidence.[50] Instead, Plaintiffs' sole challenge to the applicability of the administrative, executive, and highly compensated exemptions centered on ***how*** they were paid. ROA.5829, 16528. They argued they "were not paid on a salary basis" (as required by the regulations for all three exemptions) because "[t]hey were paid on a commission basis." ROA.16528, 16532. Citing an inapposite case (*Helix Energy Solutions Group, Inc. v. Hewitt*, 598 U.S. 39, 67 (2023)) involving an oil-and-gas worker paid a daily rate,[51] and despite unrebutted evidence that their compensation was in fact calculated, paid, and received on a monthly basis,[52] Plaintiffs argued that their pay failed the salary-basis test because it "was not calculated on a weekly or less-frequent basis." ROA.16529.

---

[50] ROA.5826-40, 17292-306, 17311.

[51] *E.g.*, ROA.16524.

[52] ROA.8604, 8622, 8678-79, 15302, 15305, 15307-08, 15315, 17280, 17314-15.

To satisfy the EAP exemptions, DOL regulations provide that employees must be "[c]ompensated on a salary basis at a rate of not less than $455 per week" or "monthly on a salary basis of $1,971.66" (rounded to $1,972 per month). 29 C.F.R. §541.600(a), (b). The HCE regulations require total annual compensation "of at least $100,000," which "must include at least $455 per week paid on a salary or fee basis." *Id.* §541.601(a), (b)(1).

The "regulations do not require that the wages be *called* a 'salary' to qualify as being paid on a 'salary basis.'" *Akins v. Worley Catastrophe Response, LLC*, 2013 WL 1907486, at *4 (E.D. La. May 8, 2013). Rather, the regulations state:

> An employee ***will be considered to be paid*** on a "salary basis" within the meaning of these regulations if the employee ***regularly receives each pay period*** on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

29 C.F.R. §541.602(a). Plaintiffs' pay met these requirements.

Agency Managers had a unique compensation structure that paid them commissions on every policy sold or renewed in their respective agencies. ROA.8603-05. Based on the premium volume of existing policies in the counties they managed, they were guaranteed to and knew in advance that they would receive

commission income that exceeded the exemptions' requirements.[53] When they entered into their contracts, they were assigned personal books of business consisting of existing policies, which would generate renewal commissions. ROA.8605-06, 8608. Ferguson referred to his $45,000 book as "the guaranteed base [he] was given," ROA.8531, and Peek described it as his "monthly guarantee." ROA.9201. These books provided Plaintiffs with an assured base, entitling them to receive renewal commissions on the policies though they had nothing to do with the original sale. ROA.8603-07.

Plaintiffs also earned "overwrite" commissions on new policies sold by agents and on ***all*** other policies renewed within their agencies. ROA.8603-04, 8606, 8679. Ferguson, for example, knew before contracting that Matagorda County had an existing premium volume of over $5.3 million, and therefore knew his total compensation was guaranteed to be $300,000 "plus." ROA.8527, 8586, 8609, 27387-88.

The bulk of Plaintiffs' monthly compensation was based on the ***renewal*** of existing policies (ROA.8603, 8682, 28372), which required no work or new sales by Plaintiffs and was paid regardless of the hours they worked. ROA.8606-07, 8603,

[53] The record demonstrated that all but one Agency Manager's income satisfied the requirements for the HCE, and all Agency Managers' compensation satisfied the requirements for the EAP exemptions. ROA.17275.

8537, 8621-22, 8682, 15308. In Ferguson's case, for example, his county had a retention rate for previously sold policies of 92% during the relevant period. ROA. 8683, 17280, 28381. Based on these rates, the compensation structure "effectively guaranteed" Plaintiffs' commission income from renewals alone would not fall below $1,972 per month. ROA.8683 (probability of missing target was "less than 0.2%"). Indeed, Ferguson's average monthly compensation was $31,050, and his monthly renewal compensation was never less than **10 times** the $1,972 required by the salary-basis test. ROA. 8606, 17280-81.[54] There was no genuine issue of fact that the Plaintiffs' compensation was guaranteed to satisfy the salary-basis minimum and, in fact, did so every month.

### D. The District Court Erred In Holding That The Plaintiffs Did Not Satisfy The Salary-Basis Test

The court determined that the Supreme Court's opinion in *Hewitt* was "dispositive of whether … Agency Managers qualify for any" of the exemptions, ROA.21760, and concluded:

> Agency Managers do not satisfy the "salary basis" because (1) their commissions are not calculated on a weekly or less-frequent basis—they are not calculated on any unit of time—and (2) their commissions are not a predetermined amount but can fluctuate based on whether premiums are or are not paid.

[54] The evidence showed that TFB alone paid the Agency Managers between $80,965 and $400,000 annually (and between $3,522.36 and $45,000 monthly). *Id.*

ROA.21761.

For the reasons explained above, Plaintiffs' compensation arrangement was guaranteed to satisfy, and did satisfy, the salary-basis test. The *Hewitt* case involved an oil-rig toolpusher who was paid a "daily rate" that ranged from $963 to $1,341 per day. 598 U.S. at 47. Hewitt did not involve insurance, a renewal-based commission system, or commissions at all. The Court held Hewitt was not paid on a salary basis because he was paid "by the day," not "by the week (or longer)." *Id*. at 50. Unlike Plaintiffs—who received on a monthly basis a predetermined amount based on renewal commissions that was, as a matter of actuarial certainty, guaranteed to exceed the salary-basis minimum—Hewitt was not guaranteed to receive compensation every week. *Hewitt* is inapposite and does not support the district court's decision here.

### E. Alternatively, The Salary-Basis Test Is Invalid And Cannot Be Enforced

If the salary-basis test disqualifies Plaintiffs from the EAP exemptions, then the salary-basis regulation is in conflict with the FLSA and, therefore, invalid and unenforceable. The relevant statutory text is simple and clear: Congress exempted "***any*** employee employed in a bona fide executive, administrative, or professional ***capacity***." 29 U.S.C. §213(a)(1). The text's key term—"capacity"—was analyzed by the Supreme Court when construing the FLSA's outside sales exemption, which is part of the same statutory provision, Section 213(a)(1), as the EAP exemptions.

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 161 (2012). *Christopher* explained that capacity means "[p]osition, condition, character, relation." *Id.* It held that the FLSA requires an inquiry "that views an employee's ***responsibilities*** in the context of the particular industry in which the employee works." *Id.*

The validity of the salary-basis test was not before the Court in *Hewitt*. But in a dissenting opinion, Justice Kavanaugh considered whether the salary-basis test was *ultra vires*. Consistent with *Christopher*, he wrote:

> The Act ***focuses on*** whether the employee performs executive ***duties, not how … an employee is paid***. So it is questionable whether the Department's regulations—which look not only at an employee's duties but also at how much an employee is paid and how an employee is paid—will survive if and when the regulations are challenged as inconsistent with the Act. ***It is especially dubious for the regulations to focus on how an employee is paid*** … An executive employee's duties (and perhaps his total compensation) may be relevant to assessing whether the employee is a bona fide executive. But I am hard-pressed to understand why it would matter for assessing executive status whether an employee is paid by salary, wage, ***commission***, bonus, or some combination thereof.

598 U.S. at 67-68. Because the employer in *Hewitt* waived this argument, it "remains open for future resolution." *Id.* at 68. This case presents that issue.

Here, Plaintiffs conceded that they satisfied the duties tests for both exemptions, meaning they conceded they were working in an administrative or executive capacity. Interpreting the salary-basis test to exclude Plaintiffs from the

exemptions conflicts with the statute and leads to "absurd results." *Est. of Miranda v. Navistar, Inc.*, 23 F.4th 500, 506 (5th Cir. 2022).

Because the Plaintiffs were highly compensated and performed administrative and executive duties, the salary-basis test cannot be interpreted to disqualify them from statutorily-provided exemptions. This Court should hold that the Plaintiffs' compensation satisfied the salary-basis test or, in the alternative, that the salary-basis test is *ultra vires* and unenforceable.

## V. THE COURT SHOULD VACATE THE DECISION GRANTING SUMMARY JUDGMENT ON "EMPLOYEE STATUS"

The "economic realities" test used to determine worker status under the FLSA evaluates a whether a worker so depends upon an alleged employer that, "as a matter of economic reality, [he] is not in business for himself." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 379-80 (5th Cir. 2019). Five non-exhaustive factors are considered: (1) control; (2) relative investments; (3) opportunity for profit; (4) skill and initiative; and (5) permanency. *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 1043 (5th Cir. 2010). No single factor is determinative, and the factors should not be applied mechanically. *Parrish*, 917 F.3d at 380.

The district court held that Plaintiffs were the Companies' "employees" as a matter of law. ROA.14346-83, 14761-63. The court erred in (1) mechanically mapping the analysis and conclusions from *Hopkins v. Cornerstone America*, 545

F.3d 338 (5th Cir. 2008), onto this case; and (2) ignoring evidence and failing to resolve conflicting evidence in favor of the Companies. *See Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 305, 313 (5th Cir. 2021); *Yoder v. Fla. Farm Bureau Cas. Ins. Co.*, 2022 WL 1055184, at *4 (N.D. Fla. Mar. 9, 2022) (*Yoder I*), *aff'd*, 2023 WL 3151107 (11th Cir. 2023) (*Yoder II*). ). On every economic-reality factor, the Companies demonstrated, at a minimum, a dispute of material fact below.

The Court should reverse the "employee status" summary judgment and remand for a new trial.

### A. The District Court's Analysis Wrongly Tracked *Hopkins*

While *Hopkins* involved "sales leaders" in the insurance industry, they differed from Plaintiffs on every material fact. *Hopkins* did not involve multi-line agency managers; its sales leaders could sell only one product. The employer in *Hopkins* controlled sales leads, which were the "lifeblood" of the company's business model and "[t]he major determinant[]" of profit or loss, as well as all hiring decisions, sales territory, and other things. *Hopkins*, 545 F.3d at 342, 344.

The Companies, in stark contrast, showed they did not control, dictate, or use, sales leads. ROA.9892, 9901. Agency Managers derived substantial profits from brokerage products (*i.e.*, other companies' products) and were not penalized for such sales. ROA.9892-93, 16240-46, 16277, 16266-68, 8532. The Plaintiffs had "far

more control" over the recruiting and selection of agents, including advertising for new recruits, and controlled staff in theirs agencies. ROA.8604, 9891-92, 9900-01. They also controlled the hiring of their own assistants and ISRs. ROA.9891. Plaintiffs selected and applied to manage agencies in certain counties, could not be relocated without consent, and could sell products anywhere in Texas. ROA.9891, 9900, 16247-48, 9384, 8993, 8743, 8745, 8811-12. Also absent from *Hopkins*, but material here, were Plaintiffs' significant investments and expense write-offs. *See Yoder I*, 2022 WL 1055184 at *7 ("True employees simply don't invest significant capital into their work in this way.").[55]

Instead of acknowledging the fact-dependent nature of the economic realities test and crediting all evidence and inferences in the Companies' favor, the court mapped the *Hopkins* analysis onto this case. *See Parrish*, 917 F.3d at 379. In so doing, it erred.

### B. The Companies Raised An Issue Of Material Fact On Every Economic Reality Factor

#### 1. Control

In evaluating control, this Court focuses on the "details," or the "manner and method" of the work. *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 332-33 (5th

---

[55] ROA.8605-06, 9894, 16248-49, 16252-53, 16255-56, 16261; *see also* ROA.6485, 6536, 6566, 6586, 6596, 8903-04, 8905, 8909-10; 9015, 9037-38, 9098, 9213, 9217, 9363-64.

Cir. 1993). In this inquiry, standard industry requirements—which apply regardless of classification—should be discounted. *Parrish*, 917 F.3d at 382.

Plaintiffs had complete control over their schedules, daily activities, and **how** they sold and advertised insurance products,[56] but the court concluded this control was "trivial" and immaterial. ROA.9893, 14351. Had the court properly credited this evidence, it would have found that material fact disputes precluded summary judgment for Plaintiffs. *See Eberline v. Media Net, LLC*, 636 F. App'x 225, 227-28 (5th Cir. 2016).

The district court found control favored employee status because "neither party" identified a "regulation that demands Plaintiffs be captive, perform tasks not expressed in a contract, or relocate to an assigned county." ROA.14352-53. This finding exemplifies the court's failure to credit the Companies' competing evidence. Exclusivity is not determinative of control. *See Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 750-53 (5th Cir. 1983); *Yoder I*, 2022 WL 1055184 at *4 n.5.

The Companies showed that "captive" status "should not carry with it a negative connotation," and that the exclusive sales model is common across the industry and provides numerous benefits. ROA. 9908, 16284-86, 16239-40, 16246. Under Rule 56, there was no evidence to justify the court's conclusion that "captive"

---

[56] ROA.8866-67, 8868, 8873, 9126-27, 9328-29, 9339, 10502.

status negatively impacted any Plaintiff, or that some hypothetical multi-carrier arrangement would have provided Plaintiffs more control over profit and loss.

The court also credited Plaintiffs' conclusory contention that the Companies "demand[ed]" they "perform tasks not expressed in a contract," but did not consider the Companies' evidence. ROA.14353. For example, Plaintiffs described as "noncontractual" the need to "follow policies and procedures," ROA.10583, but their contracts required them to obey the law and follow all guidelines and instructions contained in Companies' rate books and manuals.[57]

Plaintiffs also had significant control over personnel in their agencies, including over who was recommended for agent contracts.[58] The court disregarded this material evidence, concluding the Companies' ministerial act of "appointing" an agent was "the ultimate say in the hiring and firing of agents." ROA.14355. The court also disregarded evidence that Plaintiffs' hired their own support staff and chose how to structure their insurance businesses. ROA.9891, 8690, 9012, 9015.[59]

---

[57] ROA.148.

[58] ROA.9891, 9907, 10347.

[59] ROA.8629.

### 2. Opportunity For Profit Or Loss

On the profit and loss factor, the court overlooked evidence of Plaintiffs' control over hiring decisions,[60] that Plaintiffs each decided where to work and applied for a contract in a specific agency location of their choosing,[61] and that they could sell insurance anywhere in Texas.[62]

The court also incorrectly analyzed the effect of the Companies' "control over books of business." The Companies "owned" the policies, but the evidence showed each Plaintiffs' "substantial economic interest in the agency's book of business," based on their capital investment and the Companies' payment of a "buyout" when their contracts terminated. ROA.16253-54.

Finally, the court erroneously concluded that Plaintiffs did not have an opportunity for profit because they were "prohibited . . . from selling competing products." ROA.14355. This finding conflicted with evidence Plaintiffs could sell dozens of brokerage products—some that compete with the Companies' products—and made significant income from those sales. ROA.9892-93, 16240-43, 16245, 16277, 16279-80. It also overlooked evidence that Plaintiffs' decision to operate through the Farm Bureau model increased, rather than constricted, their ability to

[60] ROA.9900-01, 9891.

[61] ROA.8743, 8745, 8811-12, 8993, 9384; ROA.9891, 9900, 16247-48.

[62] ROA.9901, 9892.

profit. ROA.16433-36; *see Daskam v. Allstate Corp.*, 2012 WL 4420069, at *2 (W.D. Wash. Sept. 24, 2012) ("captive" agents controlled profit and loss because they "were able to amass large books of business" under business model).

### 3. Releative Investment Factor

The district court erroneously compared "each worker's ***individual*** investment to that of the alleged employer" in its entire business. ROA.14353-55. This Circuit compares "the amount the alleged employer and employee each contribute to the ***specific job*** the employee undertakes." *Thibault*, 612 F.3d at 847. Plaintiffs pointed only to Defendants' overall operating expenses—an immaterial comparison—and provided no evidence of what ***any*** Defendant invested in ***any*** "specific job." ROA.10595-97, 14354-55. The court, moreover, overlooked Plaintiffs' substantial financial investments in their insurance businesses—hundreds of thousands of dollars in some cases.[63]

### 4. Skills And Initiatives

In analyzing the skill and initiative factor, the court overlooked evidence that "[e]ach Plaintiff was a state-licensed insurance professional with extensive and specialized skills including knowledge of dozens of P&C and life insurance products, the intricacies of insurance underwriting, the details of insurance

[63] ROA.6485, 6536, 6556, 6586, 6596.

regulation … , and the analytical ability and experience to assess risk and advise clients on complex insurance issues." ROA.16251; *see Yoder*, 2022 WL 1055184, at *8 ("[P]rofessional licensure weighs in favor of contractor status for insurance agents."); *Talbert v. Am. Risk Ins. Co.*, 2010 WL 1960124, at *3 (S.D. Tex. May 14, 2010), *aff'd*, 405 F. App'x 848 (5th Cir. 2010) (state-licensed claims adjuster "was an independent contractor").

**5. Permanency And Integrality**

The court gave too much weight to the permanency factor. ROA.14358-59. The Plaintiffs' relationship with the Companies was not permanent, and some continued in the insurance business after their contracts were terminated. ROA.8763, 9227, 16251; *Parrish*, 917 F.3d at 387 ("Such a valuable skillset shows how the permanency of the relationship may, in reality, be not all that permanent."). Their lengthy relationship did not, as a matter of law, equate to economic dependence. *See Iontchev* v. *AAA Cab Serv., Inc.*, 685 F. App'x 548, 550-51 (9th Cir. 2017) (plaintiffs "were not economically dependent" on defendant though "[t]he working relationship was often lengthy").

The court should also not have given any weight to an "integrality" factor. ROA.6319-20. No business willingly engages inessential employees *or* independent contractors, and the economic realities test focuses on the worker's dependence, not the employer's.

## CONCLUSION

For the reasons set forth above, the final judgment should be affirmed.

Dated: February 23, 2026

Respectfully submitted,

/s/ *Barry A. Moscowitz*
BARRY A. MOSCOWITZ
bmoscowitz@thompsoncoe.com
CASSIE J. DALLAS
cdallas@thompsoncoe.com
LESLIE W. RICHARDSON
lwrichardson@thompsoncoe.com
THOMPSON, COE, COUSINS & IRONS, L.L.P.
Plaza of the Americas, Suite 2500
700 North Pearl Street
Dallas, Texas 75201
Telephone: (214) 871-8200
Facsimile: (214) 871-8209

*Counsel for Appellees/Cross Appellants Texas Farm Bureau Business Corporation, Texas Farm Bureau Casualty Insurance Company, Texas Farm Bureau Mutual Insurance Company, Texas Farm Bureau Underwriters, Farm Bureau County Mutual Insurance Company and Texas Farm Bureau*

/s / *Markham R. Leventhal*
MARKHAM R. LEVENTHAL
mleventhal@carltonfields.com
SCOTT ABELES
sabeles@carltonfields.com
CARLTON FIELDS, P.A.
1625 Eye Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 965-8100
Facsimile: (202) 965-8104

STEPHANIE A. FICHERA
sfichera@carltonfields.com
CARLTON FIELDS, P.A.
2 MiamiCentral, Suite 1200
700 NW 1st Avenue
Miami, Florida 33136
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

CATHLEEN BELL BREMMER
cbell@carltonfields.com
CARLTON FIELDS, P.A.
Suite 1000
4221 West Boy Scout Boulevard
Tampa, Florida 33607
Telephone: (813) 223-7000
Facsimile: (813) 229-4133

*Counsel for Appellee/Cross Appellant Southern Farm Bureau Life Insurance Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of February, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which caused a copy to be served upon all counsel of record.

*/s/ Markham R. Leventhal*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 14,827 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

*/s/ Markham R. Leventhal*

143381931